UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

JORDAN M. HERNANDEZ,

        Plaintiff,

v.

PITCO FRIALATOR, INC.,

        Defendant.

Civil Action No.: 1:15-cv-01079

---

**DEFENDANT PITCO FRIALATOR, INC.'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

    Defendant Pitco Frialator, Inc. ("Pitco"), through its attorneys, submits the following Statement of Undisputed Material Facts in Support of Its Motion for Summary Judgment in accordance with Local Rule 56(a).

### Plaintiff's Complaint Against Pitco

    1.    Plaintiff Jordan Hernandez ("Plaintiff") filed a Verified Complaint alleging that he sustained a workplace injury on September 27, 2012, at the Chipotle restaurant located at 8020 Transit Road, Williamsville, NY (the "restaurant" or "Chipotle"). (Verified Complaint ("Compl.") ¶ 24, attached hereto as Exhibit A.)

    2.    Plaintiff alleged in his Complaint that he was working the closing shift at Chipotle, and at about 8:53 p.m., he "moved the Pitco Fryer by wheeling it to a location in the restaurant where he could power wash it" and that "after plaintiff began to push the Pitco Fryer back to its normal location, but prior to reaching the location where it was normally kept, one of the Pitco Fryer's front wheels became locked, causing the Pitco Fryer to tip over, spilling scalding grease onto the floor." (Ex. A at ¶¶ 26, 28.)

3. Plaintiff further alleged that he "tripped over the Pitco Fryer and fell to the ground," where he came into contact with hot cooking oil and sustained injury. (Ex. A at ¶ 29.)

4. Plaintiff asserted negligence and strict liability claims based on alleged failure to warn, manufacturing defect, and design defect theories. (Ex. A at ¶¶ 34-44.) He insisted that the fryer had an "[in]adequate wheel assembly" and "no safety measures on its front wheels to prevent them from locking," and that it lacked unspecified "prophylactic devices to prevent bodily contact with the scalding grease." (Ex. A at ¶¶ 31, 35.)

5. Plaintiff also asserted breach of warranty and failure to warn claims (Ex. A at ¶¶ 45-61), and a final count styled as "failure to recall/retrofit" the fryer. (Ex. A at ¶¶ 62-65.)

**Plaintiff's Testimony Regarding The Incident**

6. As part of Plaintiff's duties at the restaurant, he was responsible for cleaning the space and the wall behind the fryer. (Excerpts from Deposition Transcript of Jordan Hernandez ("Pl. Dep.") at 47:12-48:1, attached hereto as Exhibit B.)

7. As part of the nightly cleaning procedures, which Plaintiff would perform five or six times a week, he would move the fryer about two feet out of its space in order to clean behind it. (Ex. B at 53:16-19; 56:8-16.)

8. One week prior to the incident, Plaintiff was instructed by his manager to unplug the fryer, disconnect it from the gas hose and move it approximately 15 feet across the room, rather than merely pull the fryer approximately two feet from the wall to clean behind it as he had always done previously. (Ex. B at 48:16-49:10.)

9. Plaintiff testified that the idea of moving the fryer around the restaurant was something he had never been asked to do previously. (Ex. B at 49:20-22.) He testified no

one gave him a reason for doing this, other than "oh, I think this will be better." (Ex. B at 50:5-8.)

11. 10. Plaintiff testified that, on September 27, 2012, he sustained an injury while engaged in closing procedures at the Chipotle restaurant. (Ex. B at 80:16-81:21.)

11. On September 27, 2012, Plaintiff moved the fryer while it contained hot oil away from its location in a battery of appliances where it cooks food and moved it 15 feet over to the food preparation area. (Ex. B at 49:4-23; 50:1-4; 80:5-23; 81:1-21; 86:19-21; 91:1-4.)

12. Plaintiff did this because he was told to by his manager, and he cleaned the area behind the fryer's ordinary location. (Ex. B at 47:12-49:10; 80:16-81:21, 86:19-21.)

13. Plaintiff testified at his deposition that he did not "power wash" or clean the deep fryer on the date of the incident. (Ex. B at 97:8-98:13.)

14. Plaintiff testified that as he was moving the deep fryer back to its location, it stopped and he pushed it over and fell on it, burning himself on hot oil that had spilled out onto the floor as he overturned the unit. (Ex, B at 80:16-81:21.)

15. Plaintiff testified he did not see any wheel become locked, and he does not know whether any wheel became locked or whether he struck something on the floor. (Ex. B at 86:11-18; 87:23-88:5; 97:8-98:5.)   Plaintiff testified:

> Q. Okay. You – when you described the incident a moment ago you said the way I understand it a wheel locked up. is that because –you didn't see a wheel lock up, correct?
>
> A. I – yeah, I – I know that I was – it was going. What I'm saying is, I don't know if a wheel locked up or if there was something on the floor, but one of the wheels stopped moving.

3

(Ex. B at 86:11-18.)  In response to a further clarifying question, Plaintiff further testified:

> Q.   And so you don't know today whether or not the fryer stopped because the wheel hit something or whether or not the fryer stopped because of an issue with the wheel, you don't know that, correct?
>
> A.   Correct, yeah.

(Ex. B at 87:23-88:5.)

### The Fryer And Its Warnings

16. The Pitco fryer at issue is a Model 35C+ Economy Gas Fryer purchased by Chipotle from a Pitco distributor, Concept Services.  (Sales Order Acknowledgment (part of Reale Deposition Ex. 11) at P000001-P000002, attached hereto as Exhibit C.)

17. Chipotle ordered the fryer from Concept Services in August 2010, and Concept Services tendered delivery of the fryer to Chipotle in December 2010.  (Excerpts from Deposition Transcript of Anthony Reale ("Reale Dep.") at 18:13-19:8, 21:9-12, attached hereto as Exhibit D; *see* Ex. C at pages P000001-P000002.).

18. There was a bright blue and yellow sticker on the front of the fryer that specifically warned: "**CAUTION. For your protection, do not move this unit unless hot liquids are completely drained.**" (Pl. Dep. 100:1-102:22, Ex. B; warning sticker, Plaintiff's Deposition Ex. 3, attached hereto as Exhibit E.)

19. Plaintiff admits this sticker was on the Pitco fryer at the time of the incident. (Ex. B, at 100:1-102:22; Ex. E)

20. Plaintiff testified he never read this warning.  (Pl. Dep. 101:13-102:22, Ex. B; Ex. E.)

4

21. Plaintiff conceded that he did not adhere to this warning (Ex. B at 102:4-9) and that he did, in fact, move the fryer 15 feet across the kitchen while it still contained hot cooking oil.  (Ex. B at 49:8-10; 80:16-81:21.)

22. Plaintiff testified he did not follow the warning on the face of the fryer because he followed the directions of his manager who "knew what was best":

> Q. And that direction was not followed in connection with what transpired on September 27th, 2012, correct?
>
> A. Right, because as – as an employee I was listening to my manager who I believed knew what he – knew what was best.

(Ex. B at 102:4-9.)

23. Plaintiff testified that the warning sticker on the front of the fryer was legible at the time of the incident.  (Ex. B at 107:16-18;Ex. E)

24. The deep fryer also contains a warning inside of the door of the fryer (the same door that Plaintiff claims he pulled on to move the fryer on the date of the incident) that states:  "**APPLIANCE SHOULD NOT BE MOVED WITHOUT FIRST DRAINING ALL LIQUIDS FROM TANK, OTHERWISE INJURY COULD RESULT**."  (Pl. Dep. 59:10-23, 108:11-109:4, Ex. B.; Label on Door of the Pitco Fryer, Plaintiff's Deposition Ex. 5, attached hereto as Exhibit F.)   Prior to the incident, Plaintiff did not read this warning either. (Ex. B at 109:1-4.)

25. The fryer manual contains the following warning at P000024:  "**DO NOT attempt to move this appliance when the unit is at operating temperature or filled with hot shortening oil.  Serious personal injury could result if skin comes in contact with the hot surfaces or shortening oil.**"  (Pl. Dep. 126:11-127:1, Ex. B; Pitco Installation and Operation Manual, attached hereto as Exhibit J at P000024.)

26. The fryer manual contains the following warning on page 8: "**DO NOT attempt to move the appliance when it is in use or has hot liquid in it. Splashing hot liquids can cause severe burns.**" (Pl. Dep. 128:11-17, Ex. B; Ex. J at P000033.)

27. The fryer manual contains the following warning on page 12: "**At operating temperatures the shortening oil and appliance is very HOT, and can cause severe burns. Do not let the hot shortening oil touch your skin or clothing. Always wear insulated oil-proof gloves, protective clothing and eyewear when working on a hot appliance.**" (Pl. Dep. 130:3-12, Ex. B; Ex. J at P000037.)

28. Prior to his incident, Plaintiff never read any of the warnings in the fryer manual. (Pl. Dep. 102:23-103:2, Ex. B.)

29. The fryer manual was available and located in the restaurant office prior to Plaintiff's incident. (Ex. B at 128:22-129:1.)

30. Prior to his incident, Plaintiff never asked to review the fryer manual. (Ex. B at 66:19-21; 129:2-4.)

31. After the incident when Plaintiff became a kitchen manager, he required employees to read these same warnings to make sure they were operating the fryer safely at the restaurant. (Ex. B at 126:3-10; 127:2-6;129:5-8.)

32. Plaintiff also testified that he had worked in restaurant kitchens previously, that he had been burned before when working with hot cooking appliances, and that he understood the risk of burn injury from moving a deep fryer while it still contained hot oil. (Ex. B at 12:5-13:9; 23:19-23; 60:19-61:3.)

20273679.v1

33. Further, Plaintiff testified that he had seen other employees at Chipotle move the fryer, and consistent with the product warnings, these other employees always drained the fryer of cooking oil before moving it.  (Ex. B at 131:15-22.)

**Plaintiff's Prior Knowledge and Experience**

34. Plaintiff testified that he had worked in restaurant kitchens previously, that he worked on the hot side of the kitchen, that he personally worked with ranges, griddles, ovens and fryers, and that he had been burned before when working with hot cooking appliances.  (Pl. Dep. 12:5-9;13:2-9; 43:14-22, Ex. B.)

35. Plaintiff received training as part of his prior position at Ted's Hot Dogs on how use a grill and deep fryer.  (Ex. B, at 14:5-17.)

36. Safety training in a kitchen was part of this training he received, and based on this training, Plaintiff understood that to cook food on or in these appliances, they are very hot and if he were to touch the grill, or if he were to immerse his hands or fall into the cooking oil in the fryer, he would get burned.  (Ex. B at 16:3-19.)

37. As part of this training, Plaintiff was instructed to allow the fryer to cool down before touching it or cleaning it.  (Ex. B at 17:11-13.)

38. As part of this training, Plaintiff was taught to be very careful while dropping fries and onion rings into the fryer basket and lifting the baskets back out of the hot oil so that he did not burn himself.  (Ex. B at 19:9-21.)

39. Plaintiff understood the fryer baskets were to be handled with care in lowering and raising them out of the hot cooking oil because of the possibility of burn injury.  (Ex. B at 19:22-20:2.)

20273679.v1

40. Even without this safety training or the product warnings or manuals, Plaintiff understood that if the oil from a deep fryer were to splash onto him, he would be subject to burn injury. (Ex. B at 16:20-17:1.)

41. Plaintiff operated a commercial oven and received training on how to safely operate a commercial oven while employed by Regal Cinemas in 2010. (Ex. B at 22:16-20, 23:7-11.)

42. In the course of the safety training Plaintiff received at Regal and Ted's Hot Dogs, it was ingrained in Plaintiff that commercial-grade kitchen equipment is hot and you have to be careful while working around such equipment. (Ex. B at 23:12-18.)

43. Plaintiff understood the risk of burn injury from moving a deep fryer while it still contained hot oil. (Ex. B at 60:19-61:14.) Plaintiff testified:

> Q. As we talked about previously, you understood that if you splash oil on yourself that you could get burned, correct?
>
> A. Hot oil, yes.
>
> Q. And so if the oil was hot you understood in grabbing [the fryer] and pulling on it, you ran the risk of getting burned, correct?
>
> A. Yeah.
>
> Q. So you made an assumption on that particular date in question that the oil was cool, not hot?
>
> Mr. Walsh: Objection to form.
>
> A. Sure.
>
> Q. Is that correct?
>
> A. Yes.
>
> Q. Did you do anything before you pulled the fryer forward to move it the fifteen feet to determine whether or not the oil was hot?

8

  A. No.

(*Id.*)

  44. Plaintiff had seen other employees sustain burns while using hot cooking equipment. (Ex. B at 37:6-38:18.)

  45. Plaintiff had previously burned himself while working with hot kitchen appliances. (Ex. B at 43:14-22.)

### **Chipotle's Warnings and Procedures**

  46. Plaintiff's co-worker, Sobeyda Casimiro, testified that, on the date of the incident, Chipotle had a procedure in place to clean behind the fryer, that restaurant workers were trained to always check the fryer oil before attempting to clean behind the unit, that a working thermometer was available on the date of the occurrence to check the oil temperature, and that employees were never told, trained or allowed to move the fryer while it contained hot oil. (Excerpts from Deposition Transcript of Sobeyda Casimiro ("Casimiro Dep.") attached hereto as Exhibit G at 36:2-40:24, 52:2-56:9, 66:19-68:21.)

  47. Casimiro testified that the procedure to clean behind the fryer was as follows: at approximately 8:00 p.m. each night, the fryer was turned to the "off" position. (Ex. G at 36:22-25.) The temperature of the oil was checked at approximately 9:00 p.m. by two employees: the employee responsible for cleaning behind the fryer and the manager. (Ex. G at 38:1-25.) The employees checked the temperature of the oil by submerging a thermometer into the oil to ensure that the temperature was below one hundred degrees prior to touching or moving the fryer. (Ex. G at 39:9-11; 40:3-24.) After ensuring that the oil was below one hundred degrees, the employee responsible for cleaning behind the fryer was required to put

the lid on the fryer, put gloves on and then move the fryer approximately two feet away from the wall. (Ex. G at 52:2-15.)

48. Casimiro testified that if the temperature of the oil was above one hundred degrees, the employees were prohibited from touching the fryer. (Ex. G at 55:12-56:1.)

49. Casimiro also testified that that the fryer was tethered to the wall, such that it could not be moved more than a few feet to clean behind it and that the employees were prohibited from unplugging the fryer from the wall. (Ex. G at 52:7-54:15.)

50. Chipotle maintained instructions captioned "Fryer oil change disposal and interior cleaning monthly" which contain the following warning: "**Do not clean or move the fryer if it's not cool one hundred degrees or less.  Failure to follow this may result in serious injury to you or your team.**" (Pl. Dep. 109:11-110:14, Ex. B; Plaintiff's Deposition Ex. 6, attached hereto as Exhibit H.)

**Plaintiff's Failure to Preserve Evidence and Provide Notice**

51. Plaintiff did not preserve the wheels of the fryer for inspection.

52. Plaintiff did not place Pitco on notice to allow for an inspection at or near the time of the occurrence.  No photographs of the incident scene have been made available to Pitco.

53. Plaintiff has not identified any eyewitness to the occurrence.

54. Plaintiff's co-worker, Sobeyda Casimiro, was in the restaurant at the time of the incident but she did not see the incident. (Casimiro Dep. 80:1-21, 81:5-10, Ex. G.)

55. Plaintiff viewed a surveillance video of the incident (Pl. Dep. 81:20-21, Ex. B), but that video was not preserved as evidence.

20273679.v1

**Plaintiff's Purported Expert**

56. Fred Stolfi ("Stolfi"), Plaintiff's purported "expert", is not a professional engineer in New York or any other state and has no experience in the design or manufacture of deep fryers. (Excerpts from Deposition Transcript of Fred Stolfi ("Stolfi Dep.") at 18:10-16; 70:22-72:9, attached hereto as Exhibit I.)

57. Stolfi's background does not involve the design of commercial fryers. (Ex. I at 71:3-5.) Stolfi has never operated a fryer, has no patents related to fryers and testified that he is not an expert in fryer design. (Ex. I at 71:6-8, 20-24; 162:2-4 "Q: Are you an expert in fryer design? A: No.")

58. Stolfi worked in research, not product development, for the companies that employed him before his last two decades in academia, and his work related to ink jet printers and toners, hairdryers, and a "cryogenic refrigerator." (Ex. I at 21:10-24:20; 31:10-32: 18; 52:10-20.)

59. Stolfi does not purport to be a warnings expert, and he offers no criticism of Pitco's warnings. (Ex. I at 147:14-148:24.)

60. Stolfi never inspected the subject fryer or any other Pitco fryer, nor has he ever visited the incident scene. (Ex. I at 100:3-24). He also conceded that he never tested or inspected the wheels (because "no one knows where they are"). (Ex. I at 129:11-131:3.) He further concedes he is not rendering any opinion as to whether the wheels functioned properly (Ex. I at 131:4-8).

61. Stolfi performed no calculations or testing to support any opinion in this case, created no engineering drawings or sketches, performed no risk analysis, performed no cost analysis, did not create any bill of material or attempt to source any materials, create any

prototype, or come up with any detailed design, and has no work product. (Ex. I at 77:6-23; 83:2-12; 84:20-24; 94:1-7; 95:24, 96:1-19; 102:11-103:9; 107:4-23; 110:1-13; 123:13-124:1; 135:2-5, 12-17; 138:2-10.)

62. Stolfi was not retained to determine the reason for the incident, has not done any accident reconstruction, does not know "what happened in particular," and does not know how fast Plaintiff was traveling while pushing the fryer, or how sharp he turned, or if he turned, or if he hit an obstruction, or if he continued to push the fryer over after hitting an obstruction.  (Ex. I at 131:9-133:9; 138:18-22.)

63. Furthermore, Stolfi testified that Plaintiff misused the fryer, that Plaintiff engaged in conduct that was contrary to the product warnings and instructions, that there is nothing unclear about the warning on the Pitco's fryer, that oil should be drained from a commercial fryer before anyone moves it, that the risk of sustaining a burn injury while moving a deep fryer containing hot oil is open and obvious, and that the incident would not have occurred had Plaintiff followed the product warnings.  (Ex. I at 147:14-150:10.)

64. Stolfi is not rendering expert opinions and conceded "I don't know that much about the design of the fryer".  (Ex. I at 95:20, 101:23-102:10.)

65. Stolfi offered alternative design "concepts" involving a magnet lid and a magnet handle, and then admitted during his deposition: "I don't even know what parts of the fryer are magnetic."  (Ex. I at 88; 13-16).

66. Stolfi testified that he is only describing "concepts," and that he has not worked out the "details."  (Ex. I at 88:1-5; 95:4-9; 96:3-5.)  He stated that his "concepts" were not subject to any peer review, and he could not identify any fryer manufacturer that has adopted his concepts.  (Ex. I at 79:4-10; 96:8-10; 109:2-7; 137:17-138:1.)  When asked

12

what methodology he followed, he responded he does not understand the word "methodology." (Ex. I at 81:24-82:5.) He then testified how he arrived at his "concepts" as follows:

> Q. Can you identify any calculations that you made?
>
> A. No.
>
> Q. Can you identify any test that you did?
>
> A. No.
>
> Q. Can you identify any methodology that you followed on a step-by-step basis?
>
> A. Well, I teach design, so used the design method that I teach.
>
> Q. What's in your head?
>
> A. Yes.
>
> Q. There's no work product associated with the words on this paper, correct? There's nothing written down that you can show me that says, this is why I'm arriving at this conclusion?
>
> A. Correct.
>
> Q. There's nothing that you did in terms of writing things down that allowed you to arrive at the conclusions, correct?
>
> A. Correct.

(Ex. I at 102:11-103:9.) When asked whether there was anything outside of his general engineering knowledge and writing the words on the pages of his report that he did to support his concept testimony, Stolfi responded: "No." (Ex. I at 136:1-5.)

13

Dated:  June 29, 2018	Respectfully submitted,

/s/ P. Shawn Wood

P. Shawn Wood, admitted *pro hac vice*
SEYFARTH SHAW LLP
233 S. Wacker Drive, Suite 8000
Chicago, IL  60606
 (312) 460-5000
swood@seyfarth.com

Susan E. Van Gelder
GOLDBERG SEGALLA LLP
665 Main Street
Buffalo, NY  14203
(716) 566-5400
svangelder@goldbergsegalla.com

*Attorneys for Defendant
PITCO Frialator, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on June 29, 2018, a true and correct copy of the foregoing **STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** was electronically filed with the Clerk of the Court.  Notice of this filing was sent by operation of the Court's Electronic Case Filing (ECF) system, to all such parties registered for receipt of electronic notifications in this action, as indicated on the Notification of Electronic Filing (NEF) receipt.  Parties may access this filing through the Court's ECF system.

/s/ Susan E. Van Gelder
Susan E. Van Gelder

20273679.v1