# EXHIBIT I

Page 1

1   UNITED STATES DISTRICT COURT

2   WESTERN DISTRICT OF NEW YORK

3   Case No. 1:15-cv-01079

4   ---------------------------------------x

5   JORDAN HERNANDEZ,

6                      Plaintiff,

7        - against -

8   PITCO FRIALATOR, INC.,

9                      Defendant.

10  ---------------------------------------x

11                   January 26, 2018

                     11:07 a.m.

12

13  Videotaped Deposition of Expert Witness

14  FRED R. STOLFI, taken by the Defendant,

15  pursuant to Notice, held at the offices of

16  Seyfarth Shaw LLP, 620 Eighth Avenue, New

17  York, New York, before Tammy O'Berg, a

18  Shorthand Reporter and Notary Public of

19  the State of New York.

20

21

22

23

24

Page 2

1  A P P E A R A N C E S :

2

3      ZDARSKY, SAWICKI & AGOSTINELLI LLP

4      Attorneys for Plaintiff

5          1600 Main Place Tower

6          350 Main Street

7          Buffalo, New York 14202

8      BY:  GERALD T. WALSH, ESQ.

9

10     SEYFARTH SHAW LLP

11     Attorneys for Defendant

12         233 South Wacker Drive

13         Suite 8000

14         Chicago, Illinois 60606-6448

15     BY:  SHAWN WOOD, ESQ.

16

17

18 ALSO PRESENT:

19     STEPHEN KENT,

20     Videographer

21            *   *   *

22

23

24

---

Page 3

1          S T I P U L A T I O N S

2

3      IT IS HEREBY STIPULATED AND

4  AGREED, by and between the Attorneys for

5  the respective parties hereto, that filing

6  and sealing be and the same are hereby

7  waived;

8      IT IS FURTHER STIPULATED AND

9  AGREED that all objections, except as to

10 the form of the question, shall be

11 reserved to the time of the trial;

12     IT IS FURTHER STIPULATED AND

13 AGREED that the within deposition may be

14 signed and sworn to before any notary

15 public with the same force and effect as

16 though signed and sworn to before the

17 Court.

18

19

20

21

22

23

24

---

Page 4

1          (The following document was

2  premarked.)

3          (Stolfi Exhibit 1, multipage

4  expert report, marked for

5  identification, as of this date.)

6          THE VIDEOGRAPHER:  Good morning.

7  We are going on the record at 11:07

8  a.m. on January 26th, 2018.

9          Please note that the microphones

10 are sensitive and may pick up

11 whispering, private conversations, and

12 cellular interference.

13         Please turn off all cellphones

14 or place them away from the

15 microphones as they can interfere with

16 the deposition audio.

17         Audio and video recording will

18 continue to take place until all

19 parties agree to go off the record.

20         This is media unit one of the

21 recorded video deposition of Fred R.

22 Stolfi, in the matter of Jordan

23 Hernandez v. Pitco Frialator, filed in

24 the United States District Court,

---

Page 5

1  Western District of New York, Case

2  number 1:15-cv-0179 -- 01079.

3          This deposition is being held at

4  Seyfarth Shaw, located at 620 Eighth

5  Avenue.

6          My name is Stephen Kent from the

7  firm Veritext New York, and I'm the

8  videographer.  The court reporter is

9  Tammy O'Berg, also from the firm

10 Veritext New York.

11         I'm not authorized to administer

12 an oath.  I'm not related to any party

13 in the this action, nor am I

14 financially interested in its outcome.

15         Counsel and all present in the

16 room will now state their appearances

17 and affiliations for the record.

18         If there are any objections to

19 the proceeding, please state them at

20 the time of your appearances,

21 beginning with the noticing attorney.

22         Counsel will now identify

23 themselves and the parties they

24 represent.

2 (Pages 2 - 5)

Page 14

1    Q.   I do it, as well.  On a
2  deposition we need to allow the court
3  reporter to let each of us finish, and if
4  I'm doing that at all, please let me know.
5       You have a Ph.D. in mechanical
6  engineering, correct?
7    A.   Correct.
8    Q.   From Rensselear Polytechnic
9  Institute in Troy, New York?
10   A.   Correct.
11   Q.   There's some description of a
12  degree below that here on your resume.
13      Can you explain what that is?
14   A.   So one of the -- you know, one
15  of the engineering societies decided that
16  there should be a degree somewhere between
17  master's and Ph.D.  They decided to have,
18  like, an intermediate degree.  It's
19  equivalent to, like, ENG in Europe, and so
20  I received that from Columbia University.
21  Since then I don't even know if Columbia
22  gives it out anymore.
23   Q.   So they've eliminated that
24  category --

Page 15

1    A.   I think they've eliminated that
2  category; although, it still might be on
3  the books, to be honest, but it was what's
4  meant to be something between a master's
5  and a Ph.D.
6    Q.   And your Ph.D. you went for much
7  later, in 2000, whereas you graduated with
8  your bachelor's degree in 1972, correct?
9    A.   Yes.
10   Q.   Why is it that you went after,
11  what, 28 years, from -- why is it that
12  after 28 years from graduating from --
13  completing your bachelor's degree that you
14  went for the Ph.D.?
15   A.   Okay.  So right after the
16  master's, I got a job in industrial
17  research, and, really, that's what I was
18  doing for some 25 years.
19      Then I realized that, you know,
20  with the proliferation of Ph.D.s, I would
21  not have gotten hired into industrial
22  research without a Ph.D., so I started to
23  realize -- I started to realize that they
24  probably would not have hired me for the

Page 16

1  job that I was already doing; and so I
2  decided to go back to school and get the
3  Ph.D.  Xerox paid for it.
4    Q.   But then you left Xerox almost
5  right after you obtained that degree about
6  a year later?
7    A.   I actually defended in 1998, but
8  the school and I had a little disagreement
9  about how many credits I paid for.  You
10  know, what happened is the bursar's office
11  and the registrar's office combined, and
12  then they lost a lot of records.
13      And so most -- you know, the
14  thing is I spent so much time to get the
15  Ph.D., Most of the other students who were
16  affected, you know, was sort of immediate,
17  and they found the records.
18      So what they told me is that I
19  had to pay for eight more credits of
20  research at the university.  So I went
21  through my files and I actually found
22  receipts for five credits; and so I showed
23  it to them, and they said, Okay, you owe
24  us for three.  So I said, Well, actually,

Page 17

1  I don't think I owe you for anything.
2  This is all I could find.  I think I paid
3  for it all.  And they said, Well, if you
4  can find the other three, then we'll give
5  you credit for that; if not, then you owe
6  us for three credits, so I left.
7      And then as I was thinking of
8  leaving Xerox, I decided maybe it was time
9  to get the degree.  So I sort of knuckled
10  under and paid for the three credits and
11  got my degree.
12   Q.   And under what circumstances did
13  you leave Xerox?
14   A.   They had offered early
15  retirement.  They didn't actually expect
16  me to take it; because the early
17  retirement was supposed to be effective
18  January 1st of my 50th year, and so I
19  would not have qualified because I was
20  born on January 9th.
21      Then for some reason the company
22  decided it could not be January 1st, it
23  was going to be January 20th, which means
24  I qualified by 11 days; and so I told them

5 (Pages 14 - 17)

Page 18

1  I think I'd like to take it.
2          I mean, it was looking like they
3  were going to close our place.  Our lease
4  was up.  So it wasn't clear what the
5  future was where I was working, and so I
6  decided to just take early retirement.
7      Q.  So you retired at age 50?
8      A.  I retired at age 50 from Xerox.
9  I'm a retiree.
10     Q.  Sir, are you a licensed
11  professional engineer in the State of New
12  York?
13     A.  No.
14     Q.  Do you have a professional
15  engineer license in any state?
16     A.  No.
17     Q.  Your first job listed back in
18  1976 on your CV, can you explain this
19  position?
20     A.  So it's a research position.
21  Smith Corona -- so Smith Corona made
22  typewriters, and they started a very small
23  research lab in Danbury, Connecticut, to
24  do research on an electronic typewriter;

Page 19

1  and so that was my first job after RPI,
2  after the master's.
3      Q.  Was that a full-time job?
4      A.  Yeah.
5      Q.  It just says, Member of
6  technical staff.
7          Did you have a title?
8      A.  Yeah, that was it.
9      Q.  Okay.  Just member of a -- and
10  then -- above that it says, Senior member
11  research staff when you went to Phillips.
12          Did you have a title at Phillips
13  or, again, just a staff member?
14     A.  No, that, that was my title,
15  senior member research staff.
16     Q.  What is the distinction between
17  the technical staff and the research staff
18  that you delineated on the CV here?
19     A.  Different companies call it
20  different things, I guess.
21     Q.  Similar duties?
22     A.  Very similar.
23     Q.  You mentioned that Smith
24  Corona's best known as the typewriter

Page 20

1  company, right?
2      A.  Correct.
3      Q.  Actually -- the founders, the
4  Smith brothers, going back to L.C. and
5  Wilbert, they originally manufactured
6  firearms?
7      A.  I don't know.
8      Q.  Weren't they a big supplier of
9  World War II rifles?
10     A.  I have no idea.
11     Q.  During the period that you
12  worked there, they weren't making firearms
13  anymore, correct, or do you know?
14     A.  Let me think.  I don't believe
15  so.  It was a conglomerate, but I don't
16  believe firearms was part of it.
17     Q.  Do you know as you sit here
18  today?
19     A.  Huh?
20     Q.  Do you know that for sure, or do
21  you remember?
22     A.  No, I do not remember.
23     Q.  During the three-year period
24  that you worked there, you worked

Page 21

1  primarily on printers; is that correct?
2      A.  Yes.
3      Q.  Printers and copiers?
4      A.  No, no copiers; printers and
5  typewriters.
6      Q.  Okay.
7          Are those the only two products
8  you worked with?
9      A.  Yes.
10     Q.  Then at Phillips, it looks like
11  you were working with spacecraft
12  equipment, hair dryers, TV screens, and
13  medical equipment?
14     A.  To name a few.  Probably a lot
15  more things than that.  Also shavers.
16     Q.  Anything else you can think of?
17     A.  Umm, to be honest, I did a
18  fryer -- kind of a quick job for a couple
19  of weeks, but one of their consumer
20  products there, home fryers, deep fryers.
21     Q.  That was like a consumer
22  countertop-type of thing --
23     A.  Yes.
24     Q.  A little, tiny type of thing

6 (Pages 18 - 21)

Page 22

1  someone would have in a kitchen, in a home
2  kitchen?
3      A.   Yes.
4      Q.   Like something that's about a
5  foot wide or something like that?
6      A.   Yeah, like that.
7      Q.   And you only worked on that for
8  two weeks?
9      A.   Yeah.
10        Somebody brought a lawsuit
11 against Phillips because the fryer caught
12 fire, and so we brought the fire to the --
13 the fryer to the lab and tested it and
14 really couldn't get it to catch fire, so
15 we just wrote a report.  I never knew what
16 happened to it.
17     Q.   So that -- you were not in
18 charge of fryers at Phillips, correct?
19     A.   No, no.  It's a research
20 position.
21     Q.   Right.
22        So the one time that a fryer
23 ever came up in the course of working with
24 Phillips, it was strictly because of

Page 23

1  you -- you were testing it after the fact
2  in connection with litigation, right?
3      A.   Correct.
4      Q.   You were not responsible for
5  fryer design at Phillips, correct?
6      A.   No.
7      Q.   Correct?
8      A.   Correct.
9      Q.   When you went to Xerox, then,
10 you were working again with inkjet
11 printers and toners and products like
12 that, correct?
13     A.   Later on.  I actually started
14 working -- there was a manufacturing
15 research group.  So I actually started
16 working on doing manufacturing research, a
17 lot of modeling, a lot of computer
18 modeling.
19     Q.   Computer modeling of what
20 products at Xerox?
21     A.   No, like a factory, modeling a
22 factory.
23     Q.   I guess let's break it down.
24        During the time period you

Page 24

1  worked at Smith Corona, did you develop
2  any prototype for any product that was
3  eventually sold on the market?
4      A.   Probably, but I think it was
5  sold much later than when I left.  So I
6  worked on it while I was there but wasn't
7  part of the team that actually brought it
8  to market.
9      Q.   Okay.
10        So during the three years that
11 you worked at Smith Corona, did you design
12 any product that was then sold by Smith
13 Corona?
14     A.   Sort of funny to say -- I worked
15 on a product that eventually got sold by
16 Smith Corona --
17     Q.   After you left?
18     A.   -- after I left.
19        So the design could have easily
20 changed since I was there.
21     Q.   So, while at Smith Corona, you
22 didn't have any design responsibility
23 where you designed a product from
24 prototype to sale; is that correct?

Page 25

1      A.   Correct.  Just prototype design.
2      Q.   Take us through that process.
3        What was the product?
4      A.   It was an electronic printer.
5        You know, so I was actually
6  doing the control system -- it was a daisy
7  wheel.  I don't know if you remember what
8  daisy-wheel printers looked like, but it
9  was a daisy-wheel printer; and I was doing
10 the control system for the -- you know,
11 for the wheel, for the daisy wheel.
12     Q.   What did that entail, the
13 process of whatever your responsibilities
14 were in terms of design and testing?
15     A.   Well, so you have to pretty
16 much -- pretty much it's like circuit
17 design.  You know, there's a motor, the
18 daisy-wheel hammer to sort of fire the
19 daisy wheel against the paper.
20        And pretty much, in terms of
21 what I designed, was the electronics that
22 did that and the control.
23     Q.   So was the daisy printer already
24 an existing product line?

7 (Pages 22 - 25)

1  doing sort of the DC motor tract of the
2  printer.
3        There was other groups doing
4  stepper motor tracts, other people doing
5  just strictly mechanical design.
6        So there was a bunch of products
7  in parallel, you know, competing for what
8  the final product was going to be.
9    Q.   And your responsibility was on
10 the electrical controls of that unit,
11 correct?
12   A.   It was the whole DC motor
13 apparatus; so whatever that involved,
14 mechanical and electrical.
15   Q.   And you talked about component
16 selection.
17       What was involved in that part
18 of your job?
19   A.   It was the beginning of
20 microcomputers.  It's sort of like when
21 microcomputers were first invented, you
22 know.  So we were starting to incorporate
23 microcomputers into the product.  So that
24 was new because they didn't exist before.

1    Q.   Was that a particular focus of
2  yours, the controls?
3    A.   Yes.
4    Q.   Did you prepare schedules and
5  cost estimates as part of your job?
6    A.   Yes.
7    Q.   Did you prepare risk analysis as
8  part of your job?
9    A.   Not formally, no.
10   Q.   If we move on to Phillips, was
11 it the same type of job; it just had a
12 slightly different name, the member of
13 research staff instead of technical staff?
14   A.   Yes.
15   Q.   And you, likewise, were working
16 with a series of different products
17 involved in the research type of role that
18 you've just described?
19   A.   So, primarily, I worked on the
20 cryogenic refrigerator.  That was kind of
21 what I was hired to do.  But the way
22 Phillips sort of runs research is that --
23 you know, it's a multinational
24 conglomerate that sold -- they sell

1  Magnavox, they sell Phillips, they sell
2  Norelco.
3        And so if the company has a
4  problem with a particular product line,
5  they will go to research and they will
6  sort of take you away from your primary
7  responsibility to look at the problems
8  with the product, you know.  That's their
9  bread and butter.
10       So I was hired to do the
11 cryogenic -- you know, the cryogenic
12 refrigerator.  But if they had a problem
13 with shavers, you know, that they thought
14 I could contribute to, I was taken off the
15 other project and, you know, put on
16 whatever -- whatever was sort of the hot
17 topic in the corporation.  It's another
18 research lab.
19   Q.   When you were in the research
20 lab, you describe it as a state-of-the-art
21 cryogenic refrigerator for spacecraft use,
22 correct?
23   A.   Yep.
24   Q.   Explain to us non-engineers what

1  that means.
2    A.   Okay.  So NASA -- they have
3  things which image -- you know, so for
4  example, crops, they'll image the ground.
5        For those devices to work, they
6  have to be cooled well below room
7  temperature.  They have to be cooled quite
8  a bit, you know, just so that they can
9  sort of see the signature of the ground
10 that they're looking at.
11       So what NASA typically does is
12 they fly a bottle of cryogenic fluid -- so
13 they'll fly, you know, liquid nitrogen in
14 orbit so they could image, but,
15 unfortunately, eventually the liquid
16 nitrogen runs out, and then the satellite
17 is useless.
18       So what they wanted is they
19 wanted a refrigerator that would actually
20 hold cryogenic temperature, that they
21 would put their sensor on that would just
22 last, you know -- our aim was like three
23 years.
24   Q.   Did you hold separate positions

Page 50

1   A.   Yes.
2   Q.   And what did that testing
3 consist of?
4   A.   Again, the Xerox lab was very
5 well-equipped in terms of test equipment.
6        So you would look at responses
7 on an oscilloscope.  You would also do
8 frequency-response stuff using a spectrum
9 analyzer, sound measurements.  I mean, we
10 were fairly well-equipped.
11   Q.   So in that sense you would build
12 a prototype of whatever component or
13 product you were working on, correct?
14   A.   Correct.
15        You realize there's a difference
16 between research and product development.
17 Those are two actually different areas of
18 a company.
19        So for research you're sort of
20 looking at new components that the product
21 people would use to put in a product that
22 they design for sale.
23        So you don't work on the product
24 specifically, you're working on sort of

Page 51

1 components -- new components, you know,
2 that they could potentially use for the
3 product.
4   Q.   Were you in product development
5 with Xerox?
6   A.   No.
7   Q.   Were you in product development
8 with Phillips?
9   A.   No.
10   Q.   Were you in product development
11 with Smith Corona?
12   A.   Smith Corona, the research was
13 sort of smaller, so that group did product
14 development in addition to research.  It
15 wasn't my job, but the group did it.
16   Q.   But you did not do product
17 development with Smith Corona, correct?
18   A.   I'm not sure what you mean by
19 the distinction.
20        If I work on something which
21 goes into a product, is that product
22 development?  Or you want me to design the
23 entire apparatus that gets sold?
24   Q.   I'm actually building on a

Page 52

1 distinction I think you described a moment
2 ago, which is that you said we need to
3 understand that within these companies
4 where you worked, that product development
5 was separate and apart from the research
6 arm where you worked.
7        Isn't that what you said a
8 moment ago?
9   A.   Yes.
10   Q.   I just wanted to clarify that
11 you were on the research side in each of
12 the three jobs that you held before you
13 went into academia.
14   A.   Correct.
15   Q.   You were not on the product
16 development -- you personally didn't work
17 in product development at any of those
18 three companies --
19   A.   At any of those three
20 companies -- never.
21   Q.   In that sense it's product
22 development that would have a prototype,
23 that would have a working product, and
24 then research would think of ways to

Page 53

1 improve and design components or
2 improvements of the existing product line;
3 is that correct?
4   A.   Yeah, correct.
5        Also, the corporation wants to
6 do something more advanced than what
7 they've been selling.  So they would go to
8 research and say, Can you develop, you
9 know, this so that we could put it in a
10 more advanced product in the future?  So
11 we would do that aspect of it.
12   Q.   And the mere fact that a -- it
13 sounds like companies like Xerox and
14 Phillips have an entire group of engineers
15 in research that are constantly devoted
16 toward trying to think of different
17 improvements and different ways to do
18 things, correct?
19   A.   Correct.
20        So I mentioned in Holland the
21 research lab, the NatLab, was about 3,000
22 people.  Across the street there was
23 something called CFD, which was the
24 product development arm of Phillips;

14 (Pages 50 - 53)

Page 66

1 from Xerox, correct?
2    A.   Correct.
3    Q.   And you mentioned they offered
4 early retirement at Xerox.
5        What were the circumstances
6 under which you left, besides the offer of
7 early retirement?  Was that pretty much
8 it?
9    A.   Well, again, the lease was about
10 up, and there was some talk that they
11 would close the lab and move us all to
12 Webster, New York, outside of Rochester.
13       I did not want to live in
14 Webster, and so they offered me early
15 retirement.
16       And it wasn't actually as
17 good -- they offered my boss early
18 retirement two years earlier.  It was
19 actually a much better deal than I got,
20 but I figured it was the best I was going
21 to get, so I accepted it.
22    Q.   Where is Webster, New York?
23    A.   Right outside of -- right
24 outside of Rochester.

Page 67

1    Q.   And why didn't you want to live
2 there?
3    A.   You have to go there and then
4 ask.
5    Q.   But that was part of your
6 motivation to take the early retirement?
7    A.   That was the primary motivation.
8 I did not want to live in Webster.
9    Q.   Do you live in New York City?
10    A.   I live in Westchester.
11    Q.   So going back to the second page
12 of your CV, is the top of page two the
13 consulting work you do with Elmetech your
14 own consulting company?
15    A.   Yes.
16    Q.   And the bottom part is
17 describing the teaching and lecturing that
18 you did?
19    A.   Correct.
20    Q.   I don't see any list of
21 publications as part of your CV, but
22 there's a reference to you do some
23 publishing --
24    A.   I have another CV that I use for

Page 68

1 universities that lists publications.
2    Q.   And you can make that available,
3 your list of publications, and provide it
4 to counsel?
5    A.   Yes.
6        (Information requested.)
7        MR. WALSH:  Can you make a note
8 of that in the record?
9        THE COURT REPORTER:  Yes, we
10 make a list at the back of the
11 transcript.
12       THE WITNESS:  Actually, I have
13 two CVs (inaudible) --
14 BY MR. WOOD:
15    Q.   That's a good segue.
16       Turning to the first page of
17 your CV, which is sort of the cover, I see
18 in the middle of the page it says Summary
19 of Qualifications.
20       Do you see where I'm reading?
21    A.   Yes.
22    Q.   What is that for?
23    A.   That's mostly for consulting.
24 That's what I tell people I can kind of

Page 69

1 do.
2    Q.   And this is the resume you said
3 you use outside of academia --
4    A.   Correct.
5    Q.   More in connection with
6 marketing your consulting work?
7    A.   Yes.
8    Q.   And that includes consulting for
9 litigation?
10    A.   Yes.
11    Q.   When did you develop that
12 Summary of Qualifications?
13    A.   Probably when I left Xerox.
14 When I left Xerox, I decided that -- when
15 I was working at Xerox, I always wondered
16 if I would like to consult, and I wondered
17 if I would like to teach (indicating).
18       So Xerox offered me early
19 retirement, which was essentially
20 full-time pay for six months; and so I
21 figured it was an opportunity to see if I
22 would like those two things.
23       You know, as it turns out, I
24 really enjoy teaching.  I'm not that crazy

18 (Pages 66 - 69)

Page 70

1 about consulting, but it pays better.
2    Q.   You mentioned that retirement --
3 but only for six months.
4         Do you still get paid by
5 Xerox --
6    A.   No.  That was the condition of
7 taking early retirement, is they would
8 give you full-time pay for six months.
9    Q.   And then what?
10   A.   And then you're on your own.
11   Q.   And this bottom part of this
12 first page of your CV there's a listing of
13 Professional Awards and Affiliations,
14 correct?
15   A.   Correct.
16   Q.   Are any of these awards in the
17 last 20 years?
18   A.   No.
19   Q.   Do all of these awards relate to
20 the work you did at Xerox?
21   A.   Some at Xerox, some at Phillips.
22   Q.   Sir, before leaving your CV, I
23 just want to make clear, does your
24 background include the design of

Page 71

1 commercial fryers?
2    A.   No.
3    Q.   Have you ever personally
4 designed a commercial fryer?
5    A.   No.
6    Q.   Do any of the patents you have
7 relate to the design of commercial fryers?
8    A.   No.
9    Q.   Have any of the jobs you've held
10 related to the design of commercial
11 cooking equipment?
12   A.   No.
13   Q.   Have you ever worked in a fast
14 food restaurant?
15   A.   No.
16   Q.   Have you ever held a job that
17 required the operation of a commercial
18 fryer?
19   A.   No.
20   Q.   Have you ever operated a
21 commercial fryer?
22   A.   No.
23   Q.   No?
24   A.   No.  Sorry.

Page 72

1    Q.   Are you familiar with the
2 federal, state, and local safety standards
3 for operating a commercial fryer?
4    A.   No.
5    Q.   Are you familiar with federal,
6 state, or local safety standards regarding
7 working around hot cooking oil or hot
8 liquids?
9    A.   No.
10   Q.   The substance of your opinions
11 in this case are on pages four through 10
12 of Exhibit 1, your report, correct?
13   A.   Correct.
14   Q.   Are all of your opinions in this
15 litigation contained in this report?
16   A.   Yes.
17   Q.   As you sit here today, do you
18 have any other opinions?
19   A.   No.
20   Q.   Is there something else you plan
21 to do to offer new opinions, or are these
22 your opinions?
23   A.   Well, I'd like to review the
24 expert report that's coming from Pitco,

Page 73

1 and if they criticize this report, I would
2 like an opportunity to respond.
3    Q.   Other than that, is there
4 anything you plan to do in connection with
5 the engagement in this litigation to offer
6 any different or new opinions?
7    A.   Umm, what I would like to do is
8 I would like to examine the patent record
9 to see if -- I know Pitco and -- I believe
10 it's called Middleby, their parent
11 company, do not have patents related to
12 commercial fryers, but I wanted to see if
13 perhaps another company has a patent,
14 which I sort of describe in this report.
15   Q.   But you have not done that
16 research as you sit here today, correct?
17   A.   Correct.
18   Q.   And you did not do that research
19 before you submitted your opinions in this
20 case, correct?
21   A.   Well, I looked at the Pitco and
22 the Middleby but not other companies, no.
23   Q.   So what you just described a
24 moment ago you have not done up until the

19 (Pages 70 - 73)

1  point of submitting your report, correct?
2      A.   Correct.
3      Q.   When were you first hired in
4  connection with this litigation?
5      A.   I don't remember.  It's been a
6  while.
7           THE WITNESS:  How long?
8           MR. WALSH:  I can't answer.
9      Q.   Has it been years?
10     A.   It's been years.
11     Q.   Were you hired more than two
12  years ago?
13          THE WITNESS:  I don't know.
14     Gerry, was it more than two years ago?
15     Q.   You don't have to do homework.
16  You can just tell me if you know.
17     A.   I have records, but I don't
18  recall the first time I was approached.
19     Q.   What would be the record you'd
20  look at to refresh your recollection
21  regarding that question?
22     A.   Probably e-mails from Gerry's
23  associate.
24     Q.   Have you worked with Gerry

1  previously?
2      A.   No.
3      Q.   When did you reach the opinions
4  that you're offering in this case?
5      A.   I don't know.  They sort of
6  developed slowly over the time since I was
7  first approached.
8      Q.   Turning to page 10, you're
9  offering three opinions in this case,
10  correct?
11     A.   Correct.
12     Q.   Or what you call two categories
13  of opinions, but it looks like three
14  opinions --
15     A.   Correct.
16     Q.   -- that are listed here on page
17  10, correct?
18     A.   Correct.
19     Q.   Category one, you mention the
20  center of gravity of the fryer, what you
21  call -- category one includes you
22  referencing the center of gravity of the
23  fryer and then what you call a temporary
24  handle, correct?

1      A.   Correct.
2      Q.   And then category two, you
3  mention a special lid secured by magnets,
4  correct?
5      A.   Magnets or mechanical latches,
6  yes.
7      Q.   With respect to your opinion
8  regarding the magnet lid or the lid with
9  latches, what is the basis for that
10  opinion?
11     A.   Well, the problem was that when
12  the fryer -- see, when the fryer was
13  moved, they put on the lid that Pitco
14  gives with the fryer, but, unfortunately,
15  that lid just sort of sits on top; and so
16  when the fryer tipped over, the lid just
17  falls off, and all the oil comes out.
18          So my feeling was if they sold
19  the lid which somehow latches to the
20  fryer, either magnetically or
21  mechanically, then at least when the fryer
22  tips over, the oil would still come out,
23  because the lid doesn't have to be
24  watertight, but it would come out much

1  more slowly, and so it wouldn't have
2  caused the injury.
3      Q.   Any other basis for the opinion
4  other than what you've just described?
5      A.   No.
6      Q.   What testing did you do to
7  research that opinion?
8      A.   None.
9      Q.   Can you show me the calculations
10  you performed in reaching that opinion?
11     A.   I didn't do any calculations.
12     Q.   Can you show me any work product
13  that you did in connection with forming
14  that opinion?
15     A.   What's a work product?
16     Q.   Anything other than the words
17  typed on the page that we're looking at
18  here on page 10.
19     A.   No, nothing.
20     Q.   Can you identify any
21  professional standards that require such a
22  lid?
23     A.   No.
24     Q.   Can you identify any

20 (Pages 74 - 77)

Page 78

1 professional studies supporting the
2 adoption of this special magnet lid or
3 latched lid?
4    A.  Well, that's the thing I was
5 going to look for in the patent record,
6 but no.
7    Q.  But as you sit here today, the
8 answer is no?
9    A.  Correct.
10    Q.  Can you tell me how many
11 commercial fryers on the market use this
12 mechanism that you're describing?
13    A.  That I do not know.
14    Q.  Can you identify any commercial
15 fryer anywhere in the world that has a
16 magnet lid?
17    A.  I can't identify one, no.
18    Q.  Did this idea just come to you
19 based --
20    A.  Well, I look at the -- I mean, I
21 teach design.  I looked at the design of
22 the fryer, and I tried to decide what I
23 would design to have prevented the
24 accident from occurring.

Page 79

1    Q.  So you worked backwards from the
2 accident, correct?
3    A.  Correct.
4    Q.  Has your idea here for this
5 design change been subjected to any type
6 of peer review?
7    A.  No.
8    Q.  Has it been adopted as part of
9 any industry standard?
10    A.  No.
11    Q.  What types of magnets would you
12 need to make this design change?  Where
13 would you source the material?
14    A.  You mean, like, what type of
15 magnet?
16    Q.  Yeah.
17       Let me take a step back.
18       Did you build a prototype of
19 this magnet lid that you're talking about?
20    A.  No.
21    Q.  Have you ever seen a prototype
22 of a magnet lid for a commercial fryer?
23    A.  Oh, for a commercial fryer, no.
24    Q.  Do you know what materials you

Page 80

1 would need to make this change, or is it
2 just a concept?
3       MR. WALSH:  Object to the form.
4       Go ahead.
5    A.  Well, it's a concept, but I do
6 know what materials I would need to build
7 it, if that's what you're asking.
8    Q.  Specifically, can you identify
9 what materials you would need to make this
10 design change?
11    A.  Permanent magnets, probably
12 neodymium iron boron.  They're sort of the
13 strongest and not that expensive these
14 days.
15    Q.  When you say "the strongest,"
16 what does that mean?
17    A.  The strongest magnetic force for
18 a given size.
19    Q.  Would you want to use the
20 strongest possible magnet?
21    A.  Probably, yes.
22    Q.  Okay.
23       What other materials would you
24 need besides that magnet that you just

Page 81

1 identified?
2    A.  Something for the lid, probably
3 stainless steel.
4    Q.  Anything else?
5    A.  No, because I don't -- I mean,
6 one possibility would be a seal of some
7 sort, you know, some sort of
8 high-temperature plastic, but I don't know
9 that that's necessary.
10       I think as long as there's a lid
11 which doesn't fall off when the fryer is
12 tipped over, it would accomplish the
13 result.
14    Q.  So would you need a seal?
15    A.  I don't think so.
16    Q.  Are magnets typically used to
17 seal hot cooking oil?
18    A.  Hot cooking oil.  No.
19    Q.  Wouldn't oil still escape if you
20 pushed the fryer over?
21    A.  Yes.
22    Q.  What methodology did you follow
23 to reach this opinion regarding the magnet
24 lid?  Can you describe any methodology you

21 (Pages 78 - 81)

Page 82

1 followed?
2    A.   What do you mean by methodology?
3    Q.   Do you understand that word,
4 "methodology"?
5    A.   No.
6    Q.   Okay.
7        Can you follow -- can you
8 describe any process you followed in
9 reaching the opinion, or is it just,
10 again, a concept that you came up with?
11    A.   You mean is there a process for
12 doing mechanical design?
13    Q.   Did you follow any methodology
14 you can describe in reaching the opinion
15 regarding the magnet lid?
16        THE WITNESS:  I'm not sure what
17    he's asking.
18    A.   I'm not sure what you're asking.
19    Q.   Okay.
20        You don't understand that
21 question?
22    A.   No.
23    Q.   We already established you did
24 not create a prototype, correct?

Page 83

1    A.   Correct.
2    Q.   You did not attempt to construct
3 the mechanism that you're describing,
4 correct?
5    A.   Correct.
6    Q.   You did not attempt to source
7 the materials in order to build any type
8 of model, correct?
9    A.   Correct.
10    Q.   You obviously, then, did not
11 test any prototype, correct?
12    A.   Correct.
13    Q.   How would your design change add
14 to the cost of the product?
15    A.   It would increase the cost.
16    Q.   Can you show me the cost
17 analysis you performed in reaching this
18 opinion regarding a magnet lid?
19    A.   The thing is I don't have any
20 details about the design of the fryer.  I
21 think it was something that was requested,
22 but Pitco did not provide them.
23        So it's difficult to design
24 something around something where you don't

Page 84

1 really know what the fryer is designed
2 like and how it's constructed.
3        I know there's mild steel in the
4 fryer because it was in the Reale
5 deposition.  I do not know where it was --
6 where it is.
7        So it's difficult to design a
8 lid for something where you don't really
9 know anything about, you know -- have no
10 details about the design of the fryer
11 itself.
12    Q.   But to answer my question, can
13 you show me the cost analysis you
14 performed in reaching this opinion?
15    A.   What I'm saying is I can't -- I
16 can't come up with a detailed design
17 without knowing the design of the fryer,
18 so I can't do a cost analysis based on a
19 concept.
20    Q.   So my next question was did you
21 perform a cost analysis in connection with
22 this magnet lid, and I believe the answer
23 is no?
24    A.   The answer is no.

Page 85

1    Q.   Can you show me any risk
2 analysis you performed to determine
3 whether this design change would create
4 other safety issues?
5    A.   No.
6    Q.   As you sit here today, can you
7 identify other safety issues this design
8 change would cause?
9    A.   No, not really.
10    Q.   You understand what the term
11 "splashing hazard" means?
12    A.   Yes.
13    Q.   Do you know understand what a
14 splashing hazard is with a piece of
15 commercial cooking equipment that employs
16 hot oil?
17    A.   Yes.
18    Q.   What does that refer to?  What
19 is a splashing hazard?
20    A.   If the oil comes out and
21 contacts somebody's skin.
22    Q.   Do you understand that of all
23 the equipment in a commercial kitchen,
24 that the fryer is a piece of equipment

22 (Pages 82 - 85)

1 that you need to be especially careful
2 around because it's a vat of hot oil that
3 the person has to work around on a daily
4 basis, correct?
5    A.   Correct.
6    Q.   What additional burn hazards
7 might exist if one were to adopt the
8 magnet lid that the you're describing?
9    A.   Additional?  None that I can
10 think of.
11   Q.   How would the user extract a
12 magnet lid from the top?
13   A.   Again, that depends on the
14 detail design, not really the concept.
15   Q.   Can you describe how the user
16 would extract a magnet lid at the top
17 without creating a splashing hazard?
18   A.   Repeat the question.
19   Q.   Yes.
20        How would the user extract a
21 magnet lid from the top of a fryer if your
22 alternative lid were adopted?
23   A.   The same way they extract the
24 lid that's provided with the fryer.

1    Q.   But you said that -- to use the
2 strongest magnet possible, right?
3    A.   Correct.
4    Q.   So that would require jerking it
5 up to pull it real hard to make sure the
6 magnet comes off?
7    A.   What I would probably do is some
8 sort of latching mechanism so that you
9 sort of move a lever to move the magnets
10 away from the fryer, if I was going to
11 design a detailed design.
12   Q.   Okay.
13        When I asked you previously
14 about what other design changes would be
15 required, you didn't mention that --
16   A.   No, no, that's part of the lid.
17   Q.   The latches and the magnets go
18 together?
19   A.   It's all part of the lid.
20   Q.   You're using both magnets and
21 latches?
22   A.   Again, that's -- you're talking
23 about details of the concept, but that
24 would be one possibility.

1    Q.   As you sit here today, you have
2 not developed the details of the concept;
3 is that fair?
4    A.   That's fair, because I don't
5 have any details of the fryer.
6    Q.   How would you disengage the
7 magnets from your design?
8        Have you figured that out yet,
9 or is that something to be figured out in
10 the future?
11   A.   That would be something based on
12 the detail design.
13   Q.   So as you sit here today, you
14 can't tell us that, correct?
15   A.   No, because I don't even know
16 what parts of the fryer are magnetic.
17   Q.   So at the time you rendered this
18 opinion, you had not determined the
19 specifics with respect to how the magnet
20 lid would come off of the fryer, correct?
21   A.   Correct.  So this is just a
22 concept.
23   Q.   Can you tell me what a pressure
24 vessel is?

1    A.   Umm -- usually a thick-walled
2 device that holds pressure higher than
3 atmospheric inside it.
4    Q.   If you adopted the change that
5 you're describing involving some sort of
6 powerful magnet or latch that the lid
7 would employ on the fryer, and someone
8 were to leave the lid on with the burner
9 still on heating the oil, what would
10 happen?
11   A.   Well, again, if there's no seal,
12 pressure shouldn't build up inside the
13 fryer.
14   Q.   But if there's no seal, you'd
15 have a greater incidence of more oil
16 leaking out in the event that it were
17 turned over, correct?
18   A.   Correct.
19   Q.   So if you were to -- the point
20 of the magnet lid, as I understand it, is
21 to keep oil in --
22   A.   To minimize the oil coming out
23 when it's tipped over.
24   Q.   Have you determined whether or

23 (Pages 86 - 89)

Page 90

1  not a pressurized situation would be
2  caused by your alternative design?
3      A.   If you left the cover on with
4  the fryer in operation?  No, I did not
5  determine that.
6      Q.   Did you identify any type of
7  pressure relief that would have to be
8  designed into the product if that design
9  were adopted with respect to the magnet
10 lid?
11     A.   I would have to look at the
12 details of how the fryer works in terms of
13 heating oil.  I don't know that it builds
14 up a pressure.  That would have to be
15 determined.
16     Q.   But you haven't considered that
17 as you sit here today, correct?
18     A.   I haven't considered that, no.
19     Q.   Correct?
20     A.   Correct.
21     Q.   What instructions would you need
22 to accompany this type of mechanism, this
23 magnet lid, to make sure that it's safely
24 used?

Page 91

1      A.   I don't know.  Instructions on
2  how to put it on and take it off.
3      Q.   Would there have to be special
4  warnings on how to do that safely without
5  splashing oil?
6      A.   I don't believe so.
7      Q.   In any event, did you consider
8  that as part of your opinions when you
9  rendered them?
10     A.   No, because I wasn't thinking of
11 the lid while the fryer was operating.
12     Q.   But the whole point is, if the
13 oil is hot, you're trying to place it over
14 hot oil --
15     A.   Right, but not being heated,
16 just hot oil in the chamber.
17     Q.   But if the oil remained hot and
18 you had to instruct people -- a user how
19 to safely disengage the magnet lid,
20 wouldn't that require some type of
21 training?
22     A.   It probably would require a
23 demonstration but not, like, formal
24 training.

Page 92

1      Q.   Would it require some type of
2  warning or instruction?
3      A.   No, I don't think so.
4      Q.   Have you developed any
5  instruction on how to tell someone to
6  safely use a magnet lid on a commercial
7  fryer containing hot oil?
8      A.   No.
9      Q.   Have you developed any warnings
10 that would need to accompany a magnet lid
11 as it related to putting it on and taking
12 it off on a commercial fryer containing
13 hot oil?
14     A.   No.
15     Q.   In any event, we established
16 that in your prior jobs tech writing and
17 the development of warnings and
18 instructions was not your focus, correct?
19     A.   Correct.
20     Q.   Even if a commercial fryer
21 manufacturer were to adopt this special
22 magnet lid that you described, that would
23 not have prevented this incident from
24 occurring, would it?

Page 93

1      A.   No.
2      Q.   A user could still decide to
3  push a commercial fryer around containing
4  hot oil, push it over and fall on it, and
5  the fryer would still contain hot oil
6  inside, correct?
7      A.   Correct, but the oil wouldn't
8  come out as fast as it would if there was
9  no cover.
10     Q.   Okay.
11         What testing did you do to
12 determine that?
13     A.   None.
14     Q.   Did you test how much oil would
15 escape?
16     A.   No.
17     Q.   Did you test how much oil it
18 would take for someone to sustain a burn
19 injury?
20     A.   No.
21     Q.   Did you discuss the speed at
22 which oil would escape when turned over if
23 your device were adopted?
24     A.   No.

24 (Pages 90 - 93)

Page 94

1    Q.   Did you perform any testing to
2  determine any of those points?
3    A.   No.
4    Q.   Did you conduct any measurements
5  or calculations to determine any of those
6  points?
7    A.   No.
8    Q.   In your report you state, The
9  magnet lid would still allow oil to escape
10 but, quote, slowly cause a mess but not an
11 injury.
12       What's the basis for that
13 opinion?
14   A.   Just that the lid would stay in
15 contact with the fryer when it was tipped
16 over, you know, so oil would escape
17 slower.
18   Q.   But the oil you're talking about
19 would still be hot, right?
20   A.   Correct.
21   Q.   And it would still escape,
22 right?
23   A.   Right.
24   Q.   And the person that fell on it

Page 95

1  would still come into contact with it?
2  Correct?
3    A.   Correct.
4    Q.   So you didn't do anything to
5  determine the rate of spillage if you
6  pushed over a hot fryer containing a
7  magnet lid, did you?
8    A.   No, because it wasn't a detailed
9  design, it was a concept.
10   Q.   Did you even determine the
11 temperature of the outside of the fryer if
12 the user pushes it over while it contains
13 hot oil and then falls on it?
14   A.   No.
15   Q.   So do you know whether in that
16 scenario falling onto the fryer would
17 still burn the person who pushed it over,
18 even if no oil escaped, because the
19 outside of the fryer is hot?
20   A.   I don't know that much about the
21 design of the fryer.  I would assume the
22 outside doesn't -- doesn't get hot when
23 the fryer contains hot oil.
24   Q.   Did you do any testing to

Page 96

1  determine that?
2    A.   No.
3    Q.   In connection with this latches
4  lid, is that likewise just a concept?
5    A.   Yes.
6    Q.   Did you create a prototype?
7    A.   No.
8    Q.   Did you subject that idea to
9  peer review?
10   A.   No.
11   Q.   Did you perform any testing in
12 connection with that suggestion?
13   A.   No.
14   Q.   Did you create any risk analysis
15 associated with that suggestion?
16   A.   No.
17   Q.   Did you conduct any cost
18 analysis with respect to that suggestion?
19   A.   No.
20   Q.   Would that suggestion add to the
21 cost of the product?
22   A.   Yes.
23   Q.   As you sit here today, can you
24 identify any fryer on the market that has

Page 97

1  such latches?
2    A.   As I sit here today, no.
3    Q.   Can you tell us what other risks
4  that latch would create?
5    A.   None that I can think of.
6    Q.   Do you understand why a lot of
7  the parts of a commercial fryer are smooth
8  so that you can't get things caught on
9  others and create splashing hazards?
10   A.   Correct.  Yes.
11   Q.   You can appreciate that that's
12 part of the -- the engineers that design
13 fryers, not just for Pitco but for all
14 fryers, make sure that it's free and clear
15 of things that can get caught on when
16 people are in a hurry and are moving
17 things around that could splash oil,
18 correct?
19   A.   Correct.
20   Q.   Do you have any appreciation, if
21 you were to create latches on the sides,
22 whether or not that could increase the
23 possibility of something getting caught
24 and creating a splash hazard?

25 (Pages 94 - 97)

Page 98

1    A.   But the latch would not be for
2  use.  The latch is for when the fryer is
3  being moved.
4    Q.   But you're suggesting that
5  people should still move it while it
6  contains hot oil and not drain it,
7  correct?
8    A.   No.
9    Q.   You think they ought to drain
10  it?
11    A.   I believe they should drain it,
12  yes.
13    Q.   And it would be a misuse to not
14  drain it, correct?
15    A.   Correct.
16        But in terms of design, you have
17  to sort of assume that the customer might
18  misuse your product.  You know, if you
19  sell a fryer with casters on it, you
20  should, as a design engineer, expect that
21  the customer might move it with hot oil in
22  it.
23    Q.   Does the manufacturer need to
24  make it foolproof?

Page 99

1    A.   It's part of the responsibility
2  of the manufacturer, yes.
3    Q.   So, in your opinion, if any
4  product is capable of causing injury, if
5  it's possible that an independent person
6  can misuse it and cause injury, that makes
7  a product defective?
8    A.   Yes.
9    Q.   Any possibility, correct?
10    A.   If there's a way to design
11  something which would make a product safer
12  for use, even for misuse, it's the
13  responsibility of the design engineer to
14  do that.
15    Q.   Any type of misuse?
16    A.   Any type of misuse.
17        You know, when you design
18  something, you have to expect that the
19  user, the customer, might misuse your
20  product in some way.
21    Q.   So let's talk about that.
22        On your proposed design changes,
23  what risk analysis did you do to determine
24  what type of misuse somebody might do with

Page 100

1  magnet lids or latches?
2    A.   None.
3    Q.   This case involves an incident
4  that occurred at the Chipotle located in
5  Williamsville, New York, on September
6  27th, 2012, correct?
7    A.   Correct.
8    Q.   Have you ever visited that
9  Chipotle restaurant where this occurred?
10    A.   No, I did not.
11    Q.   Have you inspected the fryer
12  that was involved in the incident?
13    A.   No.
14    Q.   Have you ever seen the Pitco
15  fryer that was involved in the incident?
16    A.   I saw pictures of it.
17    Q.   Other than photos, have you ever
18  laid hands on the fryer that was involved
19  in this incident?
20    A.   No.
21    Q.   Have you ever personally
22  inspected any Pitco fryer?
23    A.   Any Pitco -- no.
24    Q.   Have you ever been to a facility

Page 101

1  that manufactured commercial fryers?
2    A.   No.
3    Q.   When did you -- what did you do
4  to arrive at the opinions stated in your
5  report?
6    A.   Sorry.  Which opinion?
7    Q.   We talked about your category
8  one and category two opinions here on page
9  10 of your report, correct?
10    A.   You mean the conceptual design?
11    Q.   Just the opinions you're
12  offering -- you submitted a report in this
13  case, right?
14    A.   Right.
15    Q.   And it contains the three
16  opinions -- we've talked about one of
17  them; we're going to talk about the other
18  two in a moment -- correct?
19    A.   It contains three conceptual
20  designs for additions to the fryer which
21  would make it safe in the case of a spill
22  accident.
23    Q.   What did you do to arrive at the
24  opinions that are contained in your

26 (Pages 98 - 101)

1 report?
2    A.   Again, it's not opinions;
3 they're conceptual designs.
4    Q.   Okay.
5         What did you do to -- other than
6 typing the words on the page, what did you
7 do to arrive at your conclusions?
8    A.   Again, there's no conclusions.
9 These are concepts for how the design can
10 change to make the fryer safe.
11    Q.   Can you identify any
12 calculations that you made?
13    A.   No.
14    Q.   Can you identify any test that
15 you did?
16    A.   No.
17    Q.   Can you identify any methodology
18 that you followed on a step-by-step basis?
19    A.   Well, I teach design, so I used
20 the design method that I teach.
21    Q.   What's in your head?
22    A.   Yes.
23    Q.   There's no work product
24 associated with the words on this paper,

1 correct?
2         There's nothing written down
3 that you can show me that says, this is
4 with why I'm arriving at this conclusion?
5    A.   Correct.
6    Q.   There's nothing that you did in
7 terms of writing things down that allowed
8 you to arrive at the conclusions, correct?
9    A.   Correct.
10    Q.   And you can't point to -- let me
11 take a step back.
12         Did you review any documents?
13    A.   Yes.
14    Q.   Other than -- what documents did
15 you review?
16    A.   You know, so I looked at all of
17 the depositions provided by the attorneys,
18 and I looked at -- I looked at manuals
19 that Pitco has online in terms of the
20 fryer.
21    Q.   Anything else?
22    A.   I looked at several things
23 regarding responsibility of design
24 engineers in terms of ethics.

1    Q.   Anything else?
2    A.   No.
3    Q.   You mentioned you reviewed
4 depositions.
5         Can you tell me what depositions
6 you reviewed?
7    A.   The Hernandez one and the Reale
8 one from Pitco.
9    Q.   Any others?
10    A.   No.
11    Q.   Other than reviewing the
12 documents you described, did you do
13 anything else to arrive at your opinions?
14    A.   No.
15    Q.   You mentioned doing some --
16 reviewing some additional Pitco manuals
17 online.
18         Did you do that before or after
19 you submitted your November 2017 report?
20    A.   Before.
21    Q.   Do you need some more water?
22    A.   Yeah, probably.
23         MR. WOOD:  Can you --
24         MR. WALSH:  Keep going.

1    Q.   Sir, you charge $350 per hour,
2 correct?
3    A.   Correct.
4    Q.   How many hours have you spent on
5 this engagement?
6    A.   Oh.  Umm, I don't know.  I'd
7 have to look at the invoice.  I don't
8 remember off the top of my head.
9    Q.   Less than 10 hours?
10    A.   Maybe around 10 hours.
11    Q.   With respect to your opinion
12 regarding a magnet handle, what is the
13 basis for that opinion?
14    A.   You see, one difficulty with the
15 fryer, moving the fryer when the oil's
16 hot, is the tendency to -- you know,
17 you're standing up, and so you move the
18 fryer, you know -- you contact the fryer
19 at the very top of the fryer to move it
20 (indicating).
21         You know, so by pushing it on
22 the top, you sort of have a tendency to
23 make it fall over (indicating), you know,
24 because you're applying a force at the

27 (Pages 102 - 105)

1 very top of the fryer.
2      So my feeling was if the force
3 could be applied somewhere below the
4 center of mass -- so there's a handle
5 which, when you push the handle, it
6 actually pushes the fryer below the center
7 of mass.  Then it won't have a tendency
8 to, you know, fall over.
9      Q.   What testing did you do to reach
10 that opinion?
11     A.   None.
12     Q.   Can you show me any calculations
13 you performed in reaching that opinion?
14     A.   I tried to do a calculation,
15 but, again, I don't have the details of
16 the fryer.
17         So I tried to do a calculation
18 based on the weight of the oil and sort of
19 the shape that's shown in the manual to
20 try to estimate where the center of mass
21 was for a fryer full of oil.
22     Q.   But you never actually touched
23 the Pitco fryer in question, correct?
24     A.   Correct.

1      Q.   And you didn't take any
2 measurements, correct?
3      A.   Correct.
4      Q.   As you sit here today, you can't
5 show me any calculations, correct?
6      A.   Umm -- I guess no.  I don't know
7 where the paper is that I performed the
8 calculations on.  It was just a rough
9 estimate.
10     Q.   A rough estimate of what?
11     A.   Center of mass.
12     Q.   That's it, the same as the
13 center of gravity that you talk about in
14 your other opinion, correct?
15     A.   Sure.
16     Q.   Other than that, did you do any
17 calculations in connection with the magnet
18 handle?
19     A.   No.
20     Q.   Can you identify any
21 professional standards that require a
22 magnet handle?
23     A.   No.
24     Q.   Can you identify any

1 professional studies supporting the
2 adoption of this special magnet handle on
3 a commercial fryer?
4      A.   No.
5      Q.   Can you identify any
6 professional study that mentions the use
7 of a magnet handle on a commercial fryer?
8      A.   No.
9      Q.   Can you tell me how many
10 commercial fryers on the market use a
11 magnet handle?
12     A.   That I do not know.
13     Q.   Can you identify any commercial
14 fryer that has such a handle?
15     A.   Not off the top of my head, no.
16     Q.   Again, did this idea just come
17 to you?
18     A.   Well, based on, you know,
19 engineering consideration, you realize
20 that by pushing the fryer above the center
21 of mass you have a tendency to push it
22 over.  And so just based on engineering
23 intuition, you know that if you push it
24 below the center of mass it will not tip

1 over; it will just move forward.
2      Q.   Has this idea been subject to
3 any type of peer review?
4      A.   No.
5      Q.   Has it been adopted as part of
6 any industry standard?
7      A.   No.
8      Q.   Did you create any prototype?
9      A.   No.
10     Q.   Did you actually attempt to
11 construct the mechanism that you're
12 describing?
13     A.   No.
14     Q.   Did you test any mechanism
15 consistent with the idea you're
16 describing?
17     A.   No.
18     Q.   What type of magnets would you
19 need to make this design change?
20     A.   Probably the same ones that you
21 would use for the latch.
22     Q.   What are the materials you would
23 need to make this design change work with
24 respect to this particular fryer?

28 (Pages 106 - 109)

Page 110

1      Can you tell me the specifics of
2  all the components and materials you'd
3  have to buy?
4      A.   Again, that's detailed design.
5  That depends on the design of the fryer.
6      Q.   So am I correct you did not do a
7  detailed analysis, correct?
8      A.   Correct.
9      Q.   You only came up with a concept,
10 correct?
11     A.   Correct.  Because I have no
12 information on the -- you know, on the
13 actual design of the fryer.
14     Q.   Can you show me the cost
15 analysis that you performed in connection
16 with this suggestion regarding the magnet
17 handle?
18     A.   No.
19     Q.   Can you show me any risk
20 analysis you performed to determine
21 whether this design change would create
22 any other safety issues?
23     A.   No.
24     Q.   As you sit here today, can you

Page 111

1  identify any other safety issues that this
2  design change regarding the magnet handle
3  would cause?
4      A.   I guess if it slips it might
5  cause a problem.  So you would have to
6  ensure that it stays in contact with the
7  fryer when it's being moved.
8      Q.   What additional burn hazards
9  might exist if one were to adopt these
10 design changes?
11     A.   None that I can think of.
12     Q.   What additional potential
13 injuries might be sustained by a user if
14 somebody were to adopt these design
15 changes?
16     A.   None that I can think of.
17     Q.   How much would the design change
18 cost?
19     A.   Again, that's detail design.
20     Q.   So you do not know, correct?
21     A.   I do not know.
22     Q.   What instructions would need to
23 accompany this type of mechanism, this
24 magnet handle, to make sure that it's

Page 112

1  safely used?
2      A.   Again, that depends on the
3  detail of the design, not the concept.
4      Q.   So you don't know, correct?
5      A.   Correct.
6      Q.   Do you know what type of
7  warnings you would need to adopt?
8      A.   No.
9      Q.   Do you know what type of
10 training you would need to implement?
11     A.   No, not really.
12     Q.   How far would the handle
13 protrude from the front of the fryer?
14     A.   Again, that depends on the
15 details of the design, not the concept.
16     Q.   Do you know?
17     A.   No.
18     Q.   What are the dimensions of the
19 handle?
20     A.   Again, details.
21     Q.   You don't know?
22     A.   No.
23     Q.   Correct?
24     A.   Correct.

Page 113

1      Q.   What would be the weight of the
2  handle?
3      A.   Do not know.
4      Q.   What material would be used to
5  construct the entirety of the handle?
6      A.   Again, offhand, stainless steel,
7  but I do not know.
8      Q.   How strong would the magnet need
9  to be?
10     A.   You would want to do testing of
11 how much force it requires to actually
12 move the fryer.
13     Q.   It needs to pull the entire
14 weight of the fryer full oil, under your
15 estimate, correct?
16     A.   Correct.
17     Q.   And you did not do that testing,
18 correct?
19     A.   Correct.
20     Q.   Have you tried to construct any
21 handle and attach it to a fryer?
22     A.   No.
23     Q.   Have you tried to wheel around a
24 fryer containing such a handle?

29 (Pages 110 - 113)

Page 122

1    A.   No.  I'm not even aware that
2 they exist.
3    Q.   Okay.
4        Going back to the handle, as I
5 understand it, you're proposing that it is
6 the user that takes this magnet handle and
7 places it on the front of the fryer,
8 correct?
9    A.   Correct.
10   Q.   In rendering your opinions, did
11 you determine exactly where it was that
12 they would need to place the handle; from
13 the top to the bottom, the exact place
14 they would put it?
15   A.   No.
16   Q.   Did you determine how it is that
17 you would train people on where to put it?
18   A.   No (indicating).
19   Q.   If the handle is placed less
20 than two feet from the floor, wouldn't you
21 need to bend over to manipulate it?
22   A.   Less -- the point is the handle
23 would be in a shape so that you actually
24 push it from the top, but it applies the

Page 123

1 force below the center of mass
2 (indicating).
3    Q.   So how big is this handle?  Is
4 it over a foot tall?
5    A.   Again, it depends where the
6 center of mass is.
7    Q.   It's both a crossways handle and
8 a top-to-bottom handle, because you're
9 pushing it from some other place?
10   A.   Correct.
11   Q.   Can you show the shape of the
12 handle that you're describing?
13   A.   I don't have a drawing, no.
14   Q.   Did you decide on that when you
15 rendered this opinion, to describe what
16 the handle would even look like?
17       You didn't draw it, did you?
18   A.   No, I did not draw it.  Again, I
19 don't have details of the fryer.
20   Q.   So there was no -- you did not
21 render an opinion, with respect to any
22 detailed engineering conclusion, as to
23 what that handle would even look like; is
24 that fair?

Page 124

1    A.   That's fair.
2        Again, it's not a detailed
3 design, it was a conceptual design.
4    Q.   Is the handle meant for pushing
5 or pulling?
6    A.   Both.
7    Q.   How is it that you would stop --
8 force someone to push at the handle as
9 opposed to pushing with their hands at the
10 top of the fryer?
11   A.   I'm not sure what you're asking.
12   Q.   Well, on an average human being,
13 where does the fryer sit, from the top of
14 their head to their toes?
15   A.   Probably a little bit above
16 their waist.
17   Q.   Okay.
18       So your arms hang at about your
19 waist, correct?
20   A.   Correct.
21   Q.   So if you're pushing a grocery
22 cart, if you're pushing any type of cart
23 like that, you'd typically see it about
24 waist-high, correct?

Page 125

1    A.   Correct.
2    Q.   So if you put the handle lower
3 than that because of the center of
4 gravity, how is it that you would assure
5 that somebody is using this handle
6 below -- down toward their knees as
7 opposed to pushing at their waist-high
8 place where it's located?
9    A.   Sorry.  The handle would attach
10 low, you know, but it would come up high
11 so that you would push at waist-height
12 (indicating).
13   Q.   So there's some sort of harness
14 that would wrap around the fryer at a
15 lower point, but then the handle would
16 come up in some sort of fashion -- does
17 the handle wrap around the unit
18 waist-high -- excuse me -- at the midpoint
19 and then come up to a point waist-high
20 that is above the lip?
21   A.   In terms of concept, yes.
22   Q.   But, again, you didn't figure
23 out the details, correct?
24   A.   No details.

32 (Pages 122 - 125)

1    Q.   Even if a commercial fryer
2   manufacturer were to adopt this special
3   magnet handle that you described, that
4   would not have prevented this incident
5   from occurring, would it?
6    A.   Well, it might have, because the
7   incident might have occurred because he
8   pushed it on the top of the fryer rather
9   than lower down.
10   Q.   But it might not have stopped it
11  from happening, right?
12   A.   Just based on physics, it's hard
13  to imagine that if you push something
14  below the center of mass it would tip
15  over.
16   Q.   Well, a user could still decide
17  to push a commercial fryer around
18  containing hot oil, push it over, and the
19  fryer would still contain hot oil inside,
20  correct?
21   A.   Yes.
22   Q.   If -- if the user wheels a fryer
23  with hot oil around, pushes it over and
24  falls on it, that could happen with or

1   without a handle, right?
2    A.   I guess.
3    Q.   In fact, here -- you didn't do
4   any testing to decide the frequency that
5   would exist with or without a handle,
6   correct?
7    A.   Correct.
8    Q.   Now, here -- how did
9   Mr. Hernandez claim that he pulled the
10  unit away from the wall?
11   A.   He claims that he sort of grabs
12  the handle on the door and pulls it so
13  that the door doesn't open but the fryer
14  moves.
15   Q.   Did you do any testing to
16  determine if Mr. Hernandez's account was
17  truthful, whether the weight of the unit
18  could be pulled out from the wall using
19  that handle?
20   A.   No.  I wasn't tasked to figure
21  out how the accident occurred.  I was
22  tasked to look at design changes that may
23  have either prevented the accident or
24  prevented the amount of injury that

1   occurred if the accident did occur.
2    Q.   So that was how the scope of
3   this engagement was defined to you,
4   correct?
5    A.   Correct.
6    Q.   In any event, there's already a
7   handle on the front of the fryer, correct?
8    A.   On the door, yes.
9    Q.   It just doesn't protrude, right?
10   A.   Correct.
11   Q.   Do you know why Mr. Hernandez
12  used that handle to pull the fryer away
13  from the wall?
14   A.   No.
15   Q.   Do you know why he just didn't
16  grab it from the sides or the lip?
17   A.   I mean, the fryer was in,
18  like -- next to other equipment, so you
19  might not have been able to grab it from
20  the side, but I do not know.
21   Q.   Isn't that how you would expect
22  somebody to pull it out, from the lip or
23  the top, waist-high, as opposed to trying
24  to tinker with a door handle?

1    A.   I mean, I have no opinion on
2   what I would expect.
3    Q.   Before we leave the subject of
4   the magnet handle, when you mention it on
5   page 10 here, it says, Pitco could also
6   sell a temporary handle to users buying
7   casters.
8        Do you see where I'm reading?
9    A.   Yes.
10   Q.   We touched on this before.
11       Just for the record, what are
12  casters?
13   A.   Casters are small wheels -- I
14  actually have one with me if you're
15  interested.
16       Casters are sort of small
17  wheels.  Why they call them casters and
18  not wheels, I do not know, but I know that
19  if it's like -- usually for heavy
20  equipment that you want to move from one
21  place to another, like a refrigerator or a
22  piano, you know, if they have wheels, you
23  would call them casters.
24   Q.   The fryer that was involved in

33 (Pages 126 - 129)

1 the September 27th, 2012 occurrence had
2 casters on it at the time, right?
3     A.   Yes.
4     Q.   Did you examine those casters?
5     A.   No.
6          Apparently, when the fryer was
7 looked at after the accident, the casters
8 are gone. Now it's on what they call
9 "seismic feet," you know, and bolted to
10 the floor.
11     Q.   When you first were engaged in
12 connection with this case, did you ask for
13 an opportunity to visit the location and
14 see if the casters were still there?
15     A.   No. I didn't really feel it
16 necessary to actually go to the location.
17     Q.   Did you ask to look at the
18 casters when you were engaged at any
19 point?
20     A.   Umm -- no, not really, because,
21 again, according to the Hernandez
22 deposition, they were gone, and no one
23 knew where they were.
24     Q.   Did you test the casters?

1     A.   No.
2     Q.   Why not?
3     A.   Nobody knows where they are.
4     Q.   As you sit here today, are you
5 rendering an opinion regarding whether the
6 casters functioned properly at the time of
7 the accident?
8     A.   No.
9     Q.   Sir, have you -- I think you
10 indicated this a moment ago, that you were
11 not retained to determine the reason for
12 the accident, correct?
13     A.   Correct.
14     Q.   So have you done any accident
15 reconstruction in connection with this
16 case?
17     A.   No.
18     Q.   Can you tell me how fast the
19 plaintiff was traveling while pushing the
20 fryer?
21     A.   No.
22     Q.   Can you tell me whether he was
23 turning the fryer at an angle at the time
24 he tipped it over?

1     A.   Just -- only based on what he
2 said, but other than that, no.
3     Q.   Can you tell me how sharp
4 plaintiff took the turn?
5     A.   How sharp what?
6     Q.   Can you tell me how sharp of a
7 turn plaintiff took while he was pushing
8 the fryer that contained hot oil?
9     A.   I believe -- you know, he said
10 that he just pulled it straight out, so
11 there was no turning involved.
12     Q.   Well, that's when he pulled it.
13          When he was pushing it and he
14 fell on it, was he turning it, or do you
15 know?
16     A.   I do not know.
17     Q.   So you don't know whether or not
18 he took any turn at that time, correct?
19     A.   Correct.
20     Q.   Can you tell me how much
21 plaintiff weighs?
22     A.   No, not off the top of my head.
23     Q.   Can you tell me how much force
24 plaintiff used while pushing the fryer?

1     A.   No.
2     Q.   Can you tell me whether the
3 plaintiff continued to push the unit over
4 after he hit an obstruction?
5     A.   I do not know.
6     Q.   Can you tell me whether or not
7 he hit an obstruction?
8     A.   No, I do not know.
9          I did ask that photographs be
10 taken of the floor in front of the fryer,
11 and I did not see any obstruction.
12     Q.   Sitting here today, you do not
13 know whether or not plaintiff hit an
14 obstruction, correct?
15     A.   Correct.
16     Q.   Have you done any testing to
17 determine the answers to any of the
18 following questions -- the questions I
19 just asked?
20     A.   No.
21     Q.   Finally, you have an opinion
22 regarding the center of gravity, correct?
23     A.   Correct.
24     Q.   And you state that, The fryer

34 (Pages 130 - 133)

1 will have a reduced tendency to tip over
2 if the center of gravity could be moved
3 closer to the ground.
4      I am reading that correctly?
5   A.   Correct.
6   Q.   You state that, This would be
7 accomplished by selling a weighted base to
8 use when buying casters, correct?
9   A.   Correct.
10   Q.   Sir, what is a weighted base?
11   A.   Umm -- heavy steel plate that
12 you would put low down on the fryer.
13   Q.   Did you construct a prototype of
14 what you're talking about in that regard?
15   A.   No.
16   Q.   Did you perform any testing to
17 support that opinion?
18   A.   No.
19   Q.   Can you show me any engineering
20 drawing that you did in connection with
21 that opinion?
22   A.   Again, that's details.  No.
23   Q.   Is this, likewise, only a
24 concept?

1   A.   Yes.
2   Q.   Am I correct that you did not
3 create any bill of material in connection
4 with this proposed design change?
5   A.   Correct.
6   Q.   What other changes would you
7 need to make to the product to accommodate
8 this change?
9   A.   Again, that's details.  It
10 depends on how it would attach to the
11 product.
12   Q.   Can you show me any work product
13 that you performed in connection with this
14 conclusion?
15   A.   No.
16   Q.   Do you even have a rough sketch?
17   A.   No.
18   Q.   Do you have anything other than
19 the words on the paper of your report to
20 support your conclusion?
21   A.   Well, just the knowledge of --
22 you know, dynamics.  So you know that if
23 you move the center of mass closer to the
24 ground it's not going to tip over.

1   Q.   Other than your generalized
2 engineering knowledge and the words on the
3 page, can you point me to any work you
4 performed that supports that conclusion?
5   A.   No.
6   Q.   How would that add to the cost
7 of the unit?
8   A.   I don't know.
9   Q.   Would it add to the cost of the
10 unit?
11   A.   Yes.
12   Q.   How much?
13   A.   I do not know.
14   Q.   Well, would that add to the cost
15 of the freight of every unit shipped?
16   A.   Yeah.
17   Q.   How much would that add to the
18 cost of the freight?
19   A.   I do not know.
20   Q.   When you're done with what
21 you're talking about, what would the unit
22 then weigh?
23   A.   I do not know.
24   Q.   Would the casters withstand the

1 extra weight?
2   A.   Umm -- you would have to check.
3 I do not know.
4   Q.   Do you know whether or not you
5 would need different casters?
6   A.   I do not know.
7   Q.   Do you know whether or not you
8 would need different size wheels?
9   A.   Different size.  I wouldn't
10 imagine you would need different size.
11   Q.   But you don't know?
12   A.   No, I do not know.
13   Q.   Can you point to any industry
14 standard that supports your conclusion
15 with respect to this design change?
16   A.   No.
17   Q.   Can you point to anywhere in
18 your report where you identify the other
19 manufacturers who have adopted this design
20 change?
21   A.   No.
22   Q.   Sitting here today, can you
23 identify any other manufacturers that have
24 adopted this design change?

35 (Pages 134 - 137)

1    A.   As I sit here today, no.

2    Q.   Can you show me the risk

3 analysis you performed to determine the

4 other risks that this design change may

5 create?

6    A.   I did not do a risk analysis.

7    Q.   Can you show me the cost

8 analysis you performed in connection with

9 the design change?

10    A.   I didn't do a cost analysis.

11    Q.   Did you subject this opinion

12 regarding center of gravity to any peer

13 review in connection with your conclusions

14 regarding commercial fryers in this case?

15    A.   No.

16    Q.   You used the words "tendency to

17 tip over."

18        Is that what happened here; one

19 day the fryer tipped over during use?

20    A.   Again, I don't know what

21 happened in particular.  I do know the

22 fryer tipped over.

23    Q.   Okay.

24        It was moved, correct?

1    A.   It was moving, yeah.

2    Q.   By the plaintiff?

3    A.   Correct.

4    Q.   With hot oil in it?

5    A.   (Indicating).

6    Q.   With hot oil in it?

7    A.   Yes.

8    Q.   Plaintiff did not allow the oil

9 to cool, correct?

10    A.   I think the plaintiff assumed

11 that the oil was cool, but, no, he did not

12 allow it to cool.

13    Q.   Did he use a thermometer to

14 determine whether or not it was -- should

15 be moved?

16    A.   My understanding is the

17 thermometer was not available.

18    Q.   Did you read the definition

19 [sic] of Miss Casimoro?

20        MR. WALSH:  I think you said

21    "definition."  You meant "deposition"?

22        MR. WOOD:  Oh, yes.

23    Q.   Have you reviewed the deposition

24 of Miss Casimoro?

1    A.   No.

2    Q.   Do you know whether or not she

3 testified that the thermometer was in

4 working order at the time of this

5 incident?

6    A.   You know, I don't know that.

7    Q.   Do you know whether she

8 testified that it was attached with a

9 clip?

10    A.   I haven't seen the deposition,

11 so I don't --

12    Q.   So, fair to say that Miss

13 Casimoro's testimony you've never

14 reviewed, and you did not review it before

15 rendering your opinions in this case; is

16 that correct?

17    A.   Correct.

18    Q.   Do you have an understanding of

19 how a commercial fryer is used in everyday

20 operation?

21    A.   Basic understanding, yes.

22    Q.   Can you explain your

23 understanding?

24    A.   Usually they have a basket, you

1 put whatever you want to fry in the basket

2 and lower it into the hot oil.

3    Q.   And those baskets are lowered in

4 and pulled out of the fryer throughout the

5 day, correct?

6    A.   Correct.

7    Q.   And the user does not need to

8 move the hot fryer while using it to cook

9 food, correct?

10    A.   Correct.

11    Q.   It stays stationary while in

12 use, correct?

13    A.   Correct.

14    Q.   It's not a hot dog cart on the

15 street, right?

16    A.   Correct.

17    Q.   And it's not a scooter or a

18 skateboard?  That's not it's intention,

19 correct?

20    A.   Correct.

21    Q.   And the fryer can be moved two

22 feet out to clean behind it, correct?

23    A.   That I -- I don't know offhand.

24    Q.   It's attached to a gas line,

36 (Pages 138 - 141)

Page 146

1 perform?
2   A.   None.
3   Q.   Had you ever performed tip
4 testing on a fryer?
5   A.   On a fryer, no.
6   Q.   How many reports has Pitco
7 received of users wheeling a fryer full of
8 hot oil around a kitchen?
9   A.   I do not know.
10   Q.   Do you know whether any
11 commercial fryer manufacturers had ever
12 received a report of users pushing a fryer
13 full of hot oil around a kitchen?
14   A.   I do not know.
15   Q.   Do you know how many fryer
16 manufacturers sell a fryer with a design
17 that is similar or identical to the Pitco
18 35C model fryer?
19   A.   There must be a few, but I don't
20 know off the top of my head.
21   Q.   Do you know how many fryer
22 manufacturers sell a fryer with a center
23 of gravity that is similar or identical to
24 the Pitco Model 35C fryer?

Page 147

1   A.   I do not know how many.
2   Q.   Do you know how many fryers are
3 currently operating in restaurants
4 throughout the world that have the same
5 design and the same center of gravity as
6 the 35 model fryer?
7   A.   I do not know.
8   Q.   Do you know whether it's more
9 than a hundred thousand?
10   A.   You know, I don't know.
11   Q.   Do you know whether it's more
12 than 500,000?
13   A.   No.
14   Q.   Mr. Stolfi, on the front of this
15 fryer there's a warning that says,
16 Caution.  For your protection do not move
17 this unit unless hot liquids are
18 completely drained, correct?
19   A.   Correct.
20   Q.   And you showed that warning in
21 your report, correct?
22   A.   Yes.
23   Q.   So if you're operating the
24 machine, you'd have to see that warning,

Page 148

1 correct?
2       MR. WALSH:  Object to the form.
3       Go ahead.
4   Q.   It was a bright yellow and blue
5 warning?
6   A.   Yes.
7   Q.   Right on the front of the fryer?
8   A.   Right on the front of the fryer.
9       But I don't know that operating
10 the machine you would look down to see the
11 warning, normally.  I mean, I wouldn't
12 know that.
13   Q.   If Mr. Hernandez had followed
14 the warning on the front of the fryer,
15 this incident would not have occurred,
16 right?
17   A.   Right.
18   Q.   This is a clear instruction,
19 right?
20   A.   Pretty clear, yes.
21   Q.   Is there anything unclear about
22 the words, Do not move this unit unless
23 hot liquids are completely drained?
24   A.   No.

Page 149

1   Q.   You've never been trained to
2 work in a restaurant, but you understand
3 what those words mean, right?
4   A.   Yes.
5   Q.   Would you agree Mr. Hernandez
6 misused the product?
7   A.   Yes, but, again --
8   Q.   Did Mr. Hernandez engage in
9 conduct that was contrary to the
10 instructions of the manufacturer?
11   A.   Yes.
12   Q.   Did Mr. Hernandez engage in
13 conduct that was contrary to the product
14 warnings?
15   A.   Yes.
16   Q.   And had he followed those
17 instructions and warnings, there would not
18 have been any hot liquid in the fryer at
19 the time it was moved, correct?
20   A.   Correct.
21   Q.   Didn't Mr. Hernandez himself
22 state that he was aware of the burn
23 hazards associated with using a fryer
24 containing hot oil?

38 (Pages 146 - 149)

1    A.   Yes.
2    Q.   Do you believe that a user would
3  understand the risk of using a fryer
4  containing hot oil?
5    A.   Yes.
6    Q.   Do you agree that the risk of
7  burn injury while moving a fryer
8  containing hot oil is open and obvious to
9  a user?
10   A.   Yes.
11   Q.   Would you agree that an employer
12  has the responsibility to train its
13  employees to use hot cooking equipment
14  safely?
15   A.   Repeat it again.
16   Q.   Sure.
17       Would you agree that an employer
18  has the responsibility to train its
19  employees to use hot cooking equipment
20  safely?
21   A.   Yes.
22   Q.   Would you agree that the workers
23  in a commercial kitchen work with hot
24  cooking equipment on a daily basis?

1    A.   Yes.
2    Q.   Would you agree that workers
3  should follow their employers' safety
4  protocols?
5    A.   Yes.
6    Q.   Would you agree that users
7  should comply with warnings that are on a
8  product that they use at work?
9    A.   See, that's a tough one, because
10  if your employer tells you to do a certain
11  thing, even though there's a warning on
12  the equipment which would tell you no, I
13  would imagine the employee would follow
14  the employer's instructions.
15   Q.   And you don't know whether Miss
16  Casimoro said that if anyone had moved a
17  fryer that far away, that they would have
18  been fired?
19   A.   No.
20   Q.   Do you know where Miss Casimoro
21  said that she saw that --
22  Mr. Hernandez lying down when they found
23  him after he had pushed the fryer over?
24   A.   Again, I don't recall that

1  deposition.  If it was e-mailed to me, I
2  might have -- it was certainly not sent to
3  me as hard copy.  Most of the others were.
4    Q.   Would you agree that workers
5  should read the written instruction manual
6  provided with the products they use at
7  work?
8    A.   Again, up to the employer.
9    Q.   Well, didn't Mr. Hernandez
10  himself emphasize the importance of
11  following the directions of the
12  manufacturer and the manufacturer's
13  instructions while using hot cooking
14  equipment?
15   A.   Yes.
16   Q.   Didn't Mr. Hernandez himself say
17  that once he became the manager he made
18  sure that everybody read the product
19  manuals of the griddle and the fryer and
20  all the cooking equipment?
21   A.   Yes.
22   Q.   Didn't Mr. Hernandez say he
23  understood that because he wanted to make
24  sure, as a manager, he would be

1  responsible for ensuring workplace safety?
2    A.   Yes.
3    Q.   Are you disagreeing with his
4  testimony regarding any of those subjects?
5    A.   No.
6    Q.   Would you agree all hot cooking
7  equipment carries a risk of burn injury?
8    A.   Yes.
9    Q.   Would you agree that following
10  the product safety instruction is
11  especially important when working with hot
12  cooking equipment in a commercial kitchen?
13   A.   Yes.
14   Q.   I wanted to ask about kind of a
15  sweeping statement, that any product could
16  be improved, on the first page of your
17  report --
18   A.   Correct.
19   Q.   It's numbered page four.
20       Do you recall that part of your
21  report?
22   A.   Yes.
23   Q.   We discussed that Smith Corona
24  had at one time manufactured firearms,

39 (Pages 150 - 153)

Page 158

1    I haven't -- those are the only
2  two depositions, and only one went to
3  trial.
4    Q.   So, in terms of the
5  word "testimony," I consider it to mean
6  that you testified at a trial, a
7  deposition or a hearing where you were
8  sworn in and you gave expert testimony.
9    Is it correct, with respect to
10 testimony, the only times you've given
11 expert testimony are in that one
12 patent-infringement case and in the
13 Guevara case?
14   A.   Correct.
15     Wait.  Hold on.
16     There might have been another
17 patent-infringement case -- I'm trying to
18 remember if we did a deposition.  I do
19 sort of remember.  I'd have to look.
20 Maybe one more patent infringement.
21   Q.   Have you ever given expert
22 testimony in any product liability or
23 personal injury case other than the
24 Guevara case?

Page 159

1    A.   Testimony in the sense of
2  deposition or trial?  No.
3    Q.   And that case involved a
4  commercial fryer, correct?
5    A.   Correct.
6    Q.   And it involves some issue
7  during the draining of the fryer, correct?
8    A.   Correct.
9    Q.   There was a motion that was
10 filed that challenged your credentials as
11 an expert, noting that you had never
12 worked with commercial fryers, correct?
13   A.   Probably.
14   Q.   In that case it was argued that
15 you, quote, exhibited no qualifications
16 whatsoever for the design of a commercial
17 fryer, correct?
18     MR. WALSH:  It was argued?  Was
19 that the question?
20     MR. WOOD:  Yes.
21     MR. WALSH:  Object to the form.
22     Go ahead.
23   A.   What's the question?
24   Q.   And in fact --

Page 160

1    MR. WALSH:  He asked, "What's
2  the question?"
3    MR. WOOD:  I know.
4    MR. WALSH:  Do you want him to
5  answer it?
6    Are you going to restate the
7  question?
8    MR. WOOD:  Yeah.
9  BY MR. WOOD:
10   Q.   In fact, wasn't a motion filed
11 in the Guevara case where it was argued
12 that you, quote, exhibited no
13 qualifications whatsoever for the design
14 of a commercial fryer?
15   A.   I don't know.  I wouldn't be
16 surprised.
17   Q.   Do you know if a motion was
18 filed that also challenged the fact that
19 you gave opinions without doing any
20 testing?
21   A.   It could have been, but I did do
22 some testing on that product.
23   Q.   Well --
24   A.   It might have been after the --

Page 161

1  yes.
2    Q.   The motion?
3    A.   The motion.
4    Q.   Let me ask -- after there was a
5  motion filed in the Guevara case
6  challenging your opinions based on lack of
7  reliability and lack of testing, did you
8  then go back in the case and do some type
9  of testing after your first report?
10   A.   Yes.
11   Q.   Okay.
12     And then you issued a second
13 report, right?
14   A.   Yes.
15   Q.   And still later you offered a
16 third report?
17   A.   That I do not remember.
18   Q.   Do you know why you did more
19 than one report in that case?
20   A.   Again, I think some of it was in
21 response to, you know, what the defendant
22 alleged.
23   Q.   In that Frymaster case, you were
24 claiming to be an expert in fryer design?

41 (Pages 158 - 161)

Page 162

1    A.   No.
2    Q.   Are you an expert in fryer
3  design?
4    A.   No.
5         Am I an expert in design?  Yes.
6  That's what I teach at Columbia.
7    Q.   But you understood that the
8  opinions were challenged on the basis for
9  lack of qualifications and unreliability,
10  correct?
11    A.   I think that's just standard
12  practice.
13        Yes.
14    Q.   And one of those challenges
15  included that you were not an expert in
16  fryer design, correct?
17    A.   I do not know, but I wouldn't be
18  surprised.
19    Q.   To your knowledge, was there
20  ever a court ruling deciding whether you
21  would be allowed to give opinions on fryer
22  design in that case?
23    A.   No.
24    Q.   Did you testify at the trial in

Page 163

1  that case?
2    A.   No.
3         (Stolfi Exhibit 2, multipage
4      Exhibit A to Affirmation, marked for
5      identification, as of this date.)
6         (Discussion off the record.)
7  BY MR. WOOD:
8    Q.   Sir, showing you what has been
9  marked Stolfi Exhibit number 2, can you
10  identify that document for the record?
11    A.   It was the document I generated
12  for the Guevara versus Frymaster case.
13    Q.   That was over a decade ago,
14  right?
15    A.   Over a decade ago, yes.
16    Q.   The date on this report is
17  September 18th, 2007, correct?
18    A.   Right.
19    Q.   Is this a true and correct copy
20  of the report that you issued in that
21  Frymaster case?
22        MR. WALSH:  Well, you just gave
23      it to him five seconds ago.
24        MR. WOOD:  That's fine.

Page 164

1         MR. WALSH:  You want him to take
2      time to read it?
3         (Witness perusing document.)
4    A.   It looks correct.
5    Q.   Can you identify this document?
6         You can look at it.  It's 25
7  pages -- that it is your report that you
8  issued in that case?
9    A.   I believe it is.
10    Q.   Do you recognize it as your work
11  product?
12    A.   You know, again, just not
13  reading through the entire thing, but,
14  yes, it looks like it.
15    Q.   It has a court stamp at the top.
16  We retrieved this from the court file, and
17  I can represent to you -- we can certainly
18  represent to you we didn't swap in pages
19  to trick anybody, but I just need a clean
20  question here to ask one more time.
21         So, having had an opportunity to
22  take as long as you need to look at Stolfi
23  Exhibit 2, can you identify this document
24  as a true and correct copy of the report

Page 165

1  you issued in the Guevara versus Frymaster
2  case?
3    A.   Yes.
4    Q.   And is this the first report you
5  issued?
6    A.   Yes, I believe so.
7    Q.   Do you still have copies of your
8  file from that case?
9    A.   Probably.
10    Q.   So if we wanted to check your
11  second or third reports, we could get a
12  copy of that, as well?
13    A.   If I did it, sure.
14        (Information requested.)
15        MR. WALSH:  I think I've got
16      copies from the court file.  I'll send
17      them to you.
18        MR. WOOD:  That would be great.
19        MR. WALSH:  Off the record --
20      never mind.
21        MR. WOOD:  We'll go off in a
22      minute.  I'm almost finished.
23  BY MR. WOOD:
24    Q.   Have we covered all matters that

42 (Pages 162 - 165)

Page 170

```
 1      Thanks.
 2      THE VIDEOGRAPHER:  We're now off
 3  the record.  The time on the video
 4  monitor is 2:05 p.m.
 5      (Time noted:  2:05 p.m.)
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 172

```
 1          LITIGATION SUPPORT INDEX
 2
 3      REQUESTS FOR PRODUCTION OF DOCUMENTS
 4          Page    Line
 5          68      6
 6          165     14
 7          168     8
 8
 9      INFORMATION TO BE FURNISHED
10          Page    Line
11          None
12
13      QUESTIONS MARKED FOR A RULING
14          Page    Line
15          None
16
17      DIRECTION TO WITNESS NOT TO ANSWER
18          Page    Line
19          None
20
21
22
23
24
```

Page 171

```
 1          I N D E X
 2  Witness:  FRED R. STOLFI
 3  Examination by:          Page
 4  MR. WOOD              6
 5  MR. WALSH            168
 6
 7      E X H I B I T S
 8  STOLFI    DESCRIPTION       PAGE
 9  1    Multipage expert report    4
10  2    Multipage Exhibit A to    163
11       Affirmation
12
13  Counsel has retained all exhibits.
14
15
16
17
18
19
20
21
22
23
24
```

Page 173

```
 1          C E R T I F I C A T E
 2
 3      I, TAMMY O'BERG, a Registered
 4  Professional Reporter and Notary Public
 5  within and for the State of New York, do
 6  hereby certify:
 7      That FRED R. STOLFI, the witness
 8  whose examination is hereinbefore set
 9  forth, was duly sworn by me and that this
10  transcript of such examination is a true
11  record of the testimony given by such
12  witness.
13      I further certify that I am not
14  related to any of the parties to this
15  action by blood or marriage and that I am
16  in no way interested in the outcome of
17  this matter.
18      IN WITNESS WHEREOF, I have hereunto
19  set my hand this 16th day of February, 2018.
20
21      Tammy O'Berg
22
23          TAMMY O'BERG
24
```

44 (Pages 170 - 173)